109 U.S. 3 (1883)
UNITED STATES
v.
STANLEY.
UNITED STATES
v.
RYAN.
UNITED STATES
v.
NICHOLS.
UNITED STATES
v.
SINGLETON.
ROBINSON & Wife
v.
MEMPHIS AND CHARLESTON RAILROAD COMPANY.
Supreme Court of United States.
Submitted October Term, 1882.
Decided October 15th, 1883.
ON CERTIFICATE OF DIVISION FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF KANSAS.
IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF CALIFORNIA.
ON CERTIFICATE OF DIVISION FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MISSOURI.
ON CERTIFICATE OF DIVISION FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.
IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TENNESSEE.
*5 Mr. Solicitor General Phillips for the United States.
Mr. William M. Randolph for Robinson and wife, plaintiffs in error.
Mr. William Y.C. Humes and Mr. David Posten for the Memphis and Charleston Railroad Co., defendants in error.
*8 MR. JUSTICE BRADLEY delivered the opinion of the court. After stating the facts in the above language he continued:
It is obvious that the primary and important question in all *9 the cases is the constitutionality of the law: for if the law is unconstitutional none of the prosecutions can stand.
The sections of the law referred to provide as follows:
"SEC. 1. That all persons within the jurisdiction of the United States shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities, and privileges of inns, public conveyances on land or water, theatres, and other places of public amusement; subject only to the conditions and limitations established by law, and applicable alike to citizens of every race and color, regardless of any previous condition of servitude.
"SEC. 2. That any person who shall violate the foregoing section by denying to any citizen, except for reasons by law applicable to citizens of every race and color, and regardless of any previous condition of servitude, the full enjoyment of any of the accommodations, advantages, facilities, or privileges in said section enumerated, or by aiding or inciting such denial, shall for every such offence forfeit and pay the sum of five hundred dollars to the person aggrieved thereby, to be recovered in an action of debt, with full costs; and shall also, for every such offence, be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than five hundred nor more than one thousand dollars, or shall be imprisoned not less than thirty days nor more than one year: Provided, That all persons may elect to sue for the penalty aforesaid, or to proceed under their rights at common law and by State statutes; and having so elected to proceed in the one mode or the other, their right to proceed in the other jurisdiction shall be barred. But this provision shall not apply to criminal proceedings, either under this act or the criminal law of any State: And provided further, That a judgment for the penalty in favor of the party aggrieved, or a judgment upon an indictment, shall be a bar to either prosecution respectively."
Are these sections constitutional? The first section, which is the principal one, cannot be fairly understood without attending to the last clause, which qualifies the preceding part.
The essence of the law is, not to declare broadly that all persons shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities, and privileges of inns, *10 public conveyances, and theatres; but that such enjoyment shall not be subject to any conditions applicable only to citizens of a particular race or color, or who had been in a previous condition of servitude. In other words, it is the purpose of the law to declare that, in the enjoyment of the accommodations and privileges of inns, public conveyances, theatres, and other places of public amusement, no distinction shall be made between citizens of different race or color, or between those who have, and those who have not, been slaves. Its effect is to declare, that in all inns, public conveyances, and places of amusement, colored citizens, whether formerly slaves or not, and citizens of other races, shall have the same accommodations and privileges in all inns, public conveyances, and places of amusement as are enjoyed by white citizens; and vice versa. The second section makes it a penal offence in any person to deny to any citizen of any race or color, regardless of previous servitude, any of the accommodations or privileges mentioned in the first section.
Has Congress constitutional power to make such a law? Of course, no one will contend that the power to pass it was contained in the Constitution before the adoption of the last three amendments. The power is sought, first, in the Fourteenth Amendment, and the views and arguments of distinguished Senators, advanced whilst the law was under consideration, claiming authority to pass it by virtue of that amendment, are the principal arguments adduced in favor of the power. We have carefully considered those arguments, as was due to the eminent ability of those who put them forward, and have felt, in all its force, the weight of authority which always invests a law that Congress deems itself competent to pass. But the responsibility of an independent judgment is now thrown upon this court; and we are bound to exercise it according to the best lights we have.
The first section of the Fourteenth Amendment (which is the one relied on), after declaring who shall be citizens of the United States, and of the several States, is prohibitory in its character, and prohibitory upon the States. It declares that:
*11 "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."
It is State action of a particular character that is prohibited. Individual invasion of individual rights is not the subject-matter of the amendment. It has a deeper and broader scope. It nullifies and makes void all State legislation, and State action of every kind, which impairs the privileges and immunities of citizens of the United States, or which injures them in life, liberty or property without due process of law, or which denies to any of them the equal protection of the laws. It not only does this, but, in order that the national will, thus declared, may not be a mere brutum fulmen, the last section of the amendment invests Congress with power to enforce it by appropriate legislation. To enforce what? To enforce the prohibition. To adopt appropriate legislation for correcting the effects of such prohibited State laws and State acts, and thus to render them effectually null, void, and innocuous. This is the legislative power conferred upon Congress, and this is the whole of it. It does not invest Congress with power to legislate upon subjects which are within the domain of State legislation; but to provide modes of relief against State legislation, or State action, of the kind referred to. It does not authorize Congress to create a code of municipal law for the regulation of private rights; but to provide modes of redress against the operation of State laws, and the action of State officers executive or judicial, when these are subversive of the fundamental rights specified in the amendment. Positive rights and privileges are undoubtedly secured by the Fourteenth Amendment; but they are secured by way of prohibition against State laws and State proceedings affecting those rights and privileges, and by power given to Congress to legislate for the purpose of carrying such prohibition into effect; and such legislation must necessarily be predicated upon such supposed State laws or State proceedings, and be directed to the correction *12 of their operation and effect. A quite full discussion of this aspect of the amendment may be found in United States v. Cruikshank, 92 U.S. 542; Virginia v. Rives, 100 U.S. 313; and Ex parte Virginia, 100 U.S. 339.
An apt illustration of this distinction may be found in some of the provisions of the original Constitution. Take the subject of contracts, for example. The Constitution prohibited the States from passing any law impairing the obligation of contracts. This did not give to Congress power to provide laws for the general enforcement of contracts; nor power to invest the courts of the United States with jurisdiction over contracts, so as to enable parties to sue upon them in those courts. It did, however, give the power to provide remedies by which the impairment of contracts by State legislation might be counteracted and corrected: and this power was exercised. The remedy which Congress actually provided was that contained in the 25th section of the Judiciary Act of 1789, 1 Stat. 85, giving to the Supreme Court of the United States jurisdiction by writ of error to review the final decisions of State courts whenever they should sustain the validity of a State statute or authority alleged to be repugnant to the Constitution or laws of the United States. By this means, if a State law was passed impairing the obligation of a contract, and the State tribunals sustained the validity of the law, the mischief could be corrected in this court. The legislation of Congress, and the proceedings provided for under it, were corrective in their character. No attempt was made to draw into the United States courts the litigation of contracts generally; and no such attempt would have been sustained. We do not say that the remedy provided was the only one that might have been provided in that case. Probably Congress had power to pass a law giving to the courts of the United States direct jurisdiction over contracts alleged to be impaired by a State law; and under the broad provisions of the act of March 3d, 1875, ch. 137, 18 Stat. 470, giving to the circuit courts jurisdiction of all cases arising under the Constitution and laws of the United States, it is possible that such jurisdiction now exists. But under that, or any other law, it must appear as *13 well by allegation, as proof at the trial, that the Constitution had been violated by the action of the State legislature. Some obnoxious State law passed, or that might be passed, is necessary to be assumed in order to lay the foundation of any federal remedy in the case; and for the very sufficient reason, that the constitutional prohibition is against State laws impairing the obligation of contracts.
And so in the present case, until some State law has been passed, or some State action through its officers or agents has been taken, adverse to the rights of citizens sought to be protected by the Fourteenth Amendment, no legislation of the United States under said amendment, nor any proceeding under such legislation, can be called into activity: for the prohibitions of the amendment are against State laws and acts done under State authority. Of course, legislation may, and should be, provided in advance to meet the exigency when it arises; but it should be adapted to the mischief and wrong which the amendment was intended to provide against; and that is, State laws, or State action of some kind, adverse to the rights of the citizen secured by the amendment. Such legislation cannot properly cover the whole domain of rights appertaining to life, liberty and property, defining them and providing for their vindication. That would be to establish a code of municipal law regulative of all private rights between man and man in society. It would be to make Congress take the place of the State legislatures and to supersede them. It is absurd to affirm that, because the rights of life, liberty and property (which include all civil rights that men have), are by the amendment sought to be protected against invasion on the part of the State without due process of law, Congress may therefore provide due process of law for their vindication in every case; and that, because the denial by a State to any persons, of the equal protection of the laws, is prohibited by the amendment, therefore Congress may establish laws for their equal protection. In fine, the legislation which Congress is authorized to adopt in this behalf is not general legislation upon the rights of the citizen, but corrective legislation, that is, such as may be necessary and proper for counteracting such laws as the States may *14 adopt or enforce, and which, by the amendment, they are prohibited from making or enforcing, or such acts and proceedings as the States may commit or take, and which, by the amendment, they are prohibited from committing or taking. It is not necessary for us to state, if we could, what legislation would be proper for Congress to adopt. It is sufficient for us to examine whether the law in question is of that character.
An inspection of the law shows that it makes no reference whatever to any supposed or apprehended violation of the Fourteenth Amendment on the part of the States. It is not predicated on any such view. It proceeds ex directo to declare that certain acts committed by individuals shall be deemed offences, and shall be prosecuted and punished by proceedings in the courts of the United States. It does not profess to be corrective of any constitutional wrong committed by the States; it does not make its operation to depend upon any such wrong committed. It applies equally to cases arising in States which have the justest laws respecting the personal rights of citizens, and whose authorities are ever ready to enforce such laws, as to those which arise in States that may have violated the prohibition of the amendment. In other words, it steps into the domain of local jurisprudence, and lays down rules for the conduct of individuals in society towards each other, and imposes sanctions for the enforcement of those rules, without referring in any manner to any supposed action of the State or its authorities.
If this legislation is appropriate for enforcing the prohibitions of the amendment, it is difficult to see where it is to stop. Why may not Congress with equal show of authority enact a code of laws for the enforcement and vindication of all rights of life, liberty, and property? If it is supposable that the States may deprive persons of life, liberty, and property without due process of law (and the amendment itself does suppose this), why should not Congress proceed at once to prescribe due process of law for the protection of every one of these fundamental rights, in every possible case, as well as to prescribe equal privileges in inns, public conveyances, and theatres? The truth is, that the implication of a power to legislate in this manner is based *15 upon the assumption that if the States are forbidden to legislate or act in a particular way on a particular subject, and power is conferred upon Congress to enforce the prohibition, this gives Congress power to legislate generally upon that subject, and not merely power to provide modes of redress against such State legislation or action. The assumption is certainly unsound. It is repugnant to the Tenth Amendment of the Constitution, which declares that powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively or to the people.
We have not overlooked the fact that the fourth section of the act now under consideration has been held by this court to be constitutional. That section declares "that no citizen, possessing all other qualifications which are or may be prescribed by law, shall be disqualified for service as grand or petit juror in any court of the United States, or of any State, on account of race, color, or previous condition of servitude; and any officer or other person charged with any duty in the selection or summoning of jurors who shall exclude or fail to summon any citizen for the cause aforesaid, shall, on conviction thereof, be deemed guilty of a misdemeanor, and be fined not more than five thousand dollars." In Ex parte Virginia, 100 U.S. 339, it was held that an indictment against a State officer under this section for excluding persons of color from the jury list is sustainable. But a moment's attention to its terms will show that the section is entirely corrective in its character. Disqualifications for service on juries are only created by the law, and the first part of the section is aimed at certain disqualifying laws, namely, those which make mere race or color a disqualification; and the second clause is directed against those who, assuming to use the authority of the State government, carry into effect such a rule of disqualification. In the Virginia case, the State, through its officer, enforced a rule of disqualification which the law was intended to abrogate and counteract. Whether the statute book of the State actually laid down any such rule of disqualification, or not, the State, through its officer, enforced such a rule: and it is against such State action, through its officers and agents, that the last clause of the section is directed. *16 This aspect of the law was deemed sufficient to divest it of any unconstitutional character, and makes it differ widely from the first and second sections of the same act which we are now considering.
These sections, in the objectionable features before referred to, are different also from the law ordinarily called the "Civil Rights Bill," originally passed April 9th, 1866, 14 Stat. 27, ch. 31, and re-enacted with some modifications in sections 16, 17, 18, of the Enforcement Act, passed May 31st, 1870, 16 Stat. 140, ch. 114. That law, as re-enacted, after declaring that all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and none other, any law, statute, ordinance, regulation or custom to the contrary notwithstanding, proceeds to enact, that any person who, under color of any law, statute, ordinance, regulation or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any rights secured or protected by the preceding section (above quoted), or to different punishment, pains, or penalties, on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of citizens, shall be deemed guilty of a misdemeanor, and subject to fine and imprisonment as specified in the act. This law is clearly corrective in its character, intended to counteract and furnish redress against State laws and proceedings, and customs having the force of law, which sanction the wrongful acts specified. In the Revised Statutes, it is true, a very important clause, to wit, the words "any law, statute, ordinance, regulation or custom to the contrary notwithstanding," which gave the declaratory section its point and effect, are omitted; but the penal part, by which the declaration is enforced, and which is really the effective part of the law, retains the reference to State laws, by making the penalty apply only to those who should subject *17 parties to a deprivation of their rights under color of any statute, ordinance, custom, etc., of any State or Territory: thus preserving the corrective character of the legislation. Rev. St. §§ 1977, 1978, 1979, 5510. The Civil Rights Bill here referred to is analogous in its character to what a law would have been under the original Constitution, declaring that the validity of contracts should not be impaired, and that if any person bound by a contract should refuse to comply with it, under color or pretence that it had been rendered void or invalid by a State law, he should be liable to an action upon it in the courts of the United States, with the addition of a penalty for setting up such an unjust and unconstitutional defence.
In this connection it is proper to state that civil rights, such as are guaranteed by the Constitution against State aggression, cannot be impaired by the wrongful acts of individuals, unsupported by State authority in the shape of laws, customs, or judicial or executive proceedings. The wrongful act of an individual, unsupported by any such authority, is simply a private wrong, or a crime of that individual; an invasion of the rights of the injured party, it is true, whether they affect his person, his property, or his reputation; but if not sanctioned in some way by the State, or not done under State authority, his rights remain in full force, and may presumably be vindicated by resort to the laws of the State for redress. An individual cannot deprive a man of his right to vote, to hold property, to buy and sell, to sue in the courts, or to be a witness or a juror; he may, by force or fraud, interfere with the enjoyment of the right in a particular case; he may commit an assault against the person, or commit murder, or use ruffian violence at the polls, or slander the good name of a fellow citizen; but, unless protected in these wrongful acts by some shield of State law or State authority, he cannot destroy or injure the right; he will only render himself amenable to satisfaction or punishment; and amenable therefor to the laws of the State where the wrongful acts are committed. Hence, in all those cases where the Constitution seeks to protect the rights of the citizen against discriminative and unjust laws of the State by prohibiting such laws, it is not individual offences, but abrogation and *18 denial of rights, which it denounces, and for which it clothes the Congress with power to provide a remedy. This abrogation and denial of rights, for which the States alone were or could be responsible, was the great seminal and fundamental wrong which was intended to be remedied. And the remedy to be provided must necessarily be predicated upon that wrong. It must assume that in the cases provided for, the evil or wrong actually committed rests upon some State law or State authority for its excuse and perpetration.
Of course, these remarks do not apply to those cases in which Congress is clothed with direct and plenary powers of legislation over the whole subject, accompanied with an express or implied denial of such power to the States, as in the regulation of commerce with foreign nations, among the several States, and with the Indian tribes, the coining of money, the establishment of post offices and post reads, the declaring of war, etc. In these cases Congress has power to pass laws for regulating the subjects specified in every detail, and the conduct and transactions of individuals in respect thereof. But where a subject is not submitted to the general legislative power of Congress, but is only submitted thereto for the purpose of rendering effective some prohibition against particular State legislation or State action in reference to that subject, the power given is limited by its object, and any legislation by Congress in the matter must necessarily be corrective in its character, adapted to counteract and redress the operation of such prohibited State laws or proceedings of State officers.
If the principles of interpretation which we have laid down are correct, as we deem them to be (and they are in accord with the principles laid down in the cases before referred to, as well as in the recent case of United States v. Harris, 106 U.S. 629), it is clear that the law in question cannot be sustained by any grant of legislative power made to Congress by the Fourteenth Amendment. That amendment prohibits the States from denying to any person the equal protection of the laws, and declares that Congress shall have power to enforce, by appropriate legislation, the provisions of the amendment. The law in question, without any reference to adverse State legislation on the subject, *19 declares that all persons shall be entitled to equal accommodations and privileges of inns, public conveyances, and places of public amusement, and imposes a penalty upon any individual who shall deny to any citizen such equal accommodations and privileges. This is not corrective legislation; it is primary and direct; it takes immediate and absolute possession of the subject of the right of admission to inns, public conveyances, and places of amusement. It supersedes and displaces State legislation on the same subject, or only allows it permissive force. It ignores such legislation, and assumes that the matter is one that belongs to the domain of national regulation. Whether it would not have been a more effective protection of the rights of citizens to have clothed Congress with plenary power over the whole subject, is not now the question. What we have to decide is, whether such plenary power has been conferred upon Congress by the Fourteenth Amendment; and, in our judgment, it has not.
We have discussed the question presented by the law on the assumption that a right to enjoy equal accommodation and privileges in all inns, public conveyances, and places of public amusement, is one of the essential rights of the citizen which no State can abridge or interfere with. Whether it is such a right, or not, is a different question which, in the view we have taken of the validity of the law on the ground already stated, it is not necessary to examine.
We have also discussed the validity of the law in reference to cases arising in the States only; and not in reference to cases arising in the Territories or the District of Columbia, which are subject to the plenary legislation of Congress in every branch of municipal regulation. Whether the law would be a valid one as applied to the Territories and the District is not a question for consideration in the cases before us: they all being cases arising within the limits of States. And whether Congress, in the exercise of its power to regulate commerce amongst the several States, might or might not pass a law regulating rights in public conveyances passing from one State to another, is also a question which is not now before us, as the sections in question are not conceived in any such view.
*20 But the power of Congress to adopt direct and primary, as distinguished from corrective legislation, on the subject in hand, is sought, in the second place, from the Thirteenth Amendment, which abolishes slavery. This amendment declares "that neither slavery, nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction;" and it gives Congress power to enforce the amendment by appropriate legislation.
This amendment, as well as the Fourteenth, is undoubtedly self-executing without any ancillary legislation, so far as its terms are applicable to any existing state of circumstances. By its own unaided force and effect it abolished slavery, and established universal freedom. Still, legislation may be necessary and proper to meet all the various cases and circumstances to be affected by it, and to prescribe proper modes of redress for its violation in letter or spirit. And such legislation may be primary and direct in its character; for the amendment is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States.
It is true, that slavery cannot exist without law, any more than property in lands and goods can exist without law: and, therefore, the Thirteenth Amendment may be regarded as nullifying all State laws which establish or uphold slavery. But it has a reflex character also, establishing and decreeing universal civil and political freedom throughout the United States; and it is assumed, that the power vested in Congress to enforce the article by appropriate legislation, clothes Congress with power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States: and upon this assumption it is claimed, that this is sufficient authority for declaring by law that all persons shall have equal accommodations and privileges in all inns, public conveyances, and places of amusement; the argument being, that the denial of such equal accommodations and privileges is, in itself, a subjection to a species of servitude within the meaning of the amendment. Conceding the major proposition to be true, that *21 Congress has a right to enact all necessary and proper laws for the obliteration and prevention of slavery with all its badges and incidents, is the minor proposition also true, that the denial to any person of admission to the accommodations and privileges of an inn, a public conveyance, or a theatre, does subject that person to any form of servitude, or tend to fasten upon him any badge of slavery? If it does not, then power to pass the law is not found in the Thirteenth Amendment.
In a very able and learned presentation of the cognate question as to the extent of the rights, privileges and immunities of citizens which cannot rightfully be abridged by state laws under the Fourteenth Amendment, made in a former case, a long list of burdens and disabilities of a servile character, incident to feudal vassalage in France, and which were abolished by the decrees of the National Assembly, was presented for the purpose of showing that all inequalities and observances exacted by one man from another were servitudes, or badges of slavery, which a great nation, in its effort to establish universal liberty, made haste to wipe out and destroy. But these were servitudes imposed by the old law, or by long custom, which had the force of law, and exacted by one man from another without the latter's consent. Should any such servitudes be imposed by a state law, there can be no doubt that the law would be repugnant to the Fourteenth, no less than to the Thirteenth Amendment; nor any greater doubt that Congress has adequate power to forbid any such servitude from being exacted.
But is there any similarity between such servitudes and a denial by the owner of an inn, a public conveyance, or a theatre, of its accommodations and privileges to an individual, even though the denial be founded on the race or color of that individual? Where does any slavery or servitude, or badge of either, arise from such an act of denial? Whether it might not be a denial of a right which, if sanctioned by the state law, would be obnoxious to the prohibitions of the Fourteenth Amendment, is another question. But what has it to do with the question of slavery?
It may be that by the Black Code (as it was called), in the times when slavery prevailed, the proprietors of inns and public *22 conveyances were forbidden to receive persons of the African race, because it might assist slaves to escape from the control of their masters. This was merely a means of preventing such escapes, and was no part of the servitude itself. A law of that kind could not have any such object now, however justly it might be deemed an invasion of the party's legal right as a citizen, and amenable to the prohibitions of the Fourteenth Amendment.
The long existence of African slavery in this country gave us very distinct notions of what it was, and what were its necessary incidents. Compulsory service of the slave for the benefit of the master, restraint of his movements except by the master's will, disability to hold property, to make contracts, to have a standing in court, to be a witness against a white person, and such like burdens and incapacities, were the inseparable incidents of the institution. Severer punishments for crimes were imposed on the slave than on free persons guilty of the same offences. Congress, as we have seen, by the Civil Rights Bill of 1866, passed in view of the Thirteenth Amendment, before the Fourteenth was adopted, undertook to wipe out these burdens and disabilities, the necessary incidents of slavery, constituting its substance and visible form; and to secure to all citizens of every race and color, and without regard to previous servitude, those fundamental rights which are the essence of civil freedom, namely, the same right to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell and convey property, as is enjoyed by white citizens. Whether this legislation was fully authorized by the Thirteenth Amendment alone, without the support which it afterward received from the Fourteenth Amendment, after the adoption of which it was re-enacted with some additions, it is not necessary to inquire. It is referred to for the purpose of showing that at that time (in 1866) Congress did not assume, under the authority given by the Thirteenth Amendment, to adjust what may be called the social rights of men and races in the community; but only to declare and vindicate those fundamental rights which appertain to the essence of citizenship, and the enjoyment or deprivation of which constitutes the essential distinction between freedom and slavery.
*23 We must not forget that the province and scope of the Thirteenth and Fourteenth amendments are different; the former simply abolished slavery: the latter prohibited the States from abridging the privileges or immunities of citizens of the United States; from depriving them of life, liberty, or property without due process of law, and from denying to any the equal protection of the laws. The amendments are different, and the powers of Congress under them are different. What Congress has power to do under one, it may not have power to do under the other. Under the Thirteenth Amendment, it has only to do with slavery and its incidents. Under the Fourteenth Amendment, it has power to counteract and render nugatory all State laws and proceedings which have the effect to abridge any of the privileges or immunities of citizens of the United States, or to deprive them of life, liberty or property without due process of law, or to deny to any of them the equal protection of the laws. Under the Thirteenth Amendment, the legislation, so far as necessary or proper to eradicate all forms and incidents of slavery and involuntary servitude, may be direct and primary, operating upon the acts of individuals, whether sanctioned by State legislation or not; under the Fourteenth, as we have already shown, it must necessarily be, and can only be, corrective in its character, addressed to counteract and afford relief against State regulations or proceedings.
The only question under the present head, therefore, is, whether the refusal to any persons of the accommodations of an inn, or a public conveyance, or a place of public amusement, by an individual, and without any sanction or support from any State law or regulation, does inflict upon such persons any manner of servitude, or form of slavery, as those terms are understood in this country? Many wrongs may be obnoxious to the prohibitions of the Fourteenth Amendment which are not, in any just sense, incidents or elements of slavery. Such, for example, Would be the taking of private property without due process of law; or allowing persons who have committed certain crimes (horse stealing, for example) to be seized and hung by the posse comitatus without regular trial; or denying to any person, or class of persons, the right to pursue any peaceful *24 avocations allowed to others. What is called class legislation would belong to this category, and would be obnoxious to the prohibitions of the Fourteenth Amendment, but would not necessarily be so to the Thirteenth, when not involving the idea of any subjection of one man to another. The Thirteenth Amendment has respect, not to distinctions of race, or class, or color, but to slavery. The Fourteenth Amendment extends its protection to races and classes, and prohibits any State legislation which has the effect of denying to any race or class, or to any individual, the equal protection of the laws.
Now, conceding, for the sake of the argument, that the admission to an inn, a public conveyance, or a place of public amusement, on equal terms with all other citizens, is the right of every man and all classes of men, is it any more than one of those rights which the states by the Fourteenth Amendment are forbidden to deny to any person? And is the Constitution violated until the denial of the right has some State sanction or authority? Can the act of a mere individual, the owner of the inn, the public conveyance or place of amusement, refusing the accommodation, be justly regarded as imposing any badge of slavery or servitude upon the applicant, or only as inflicting an ordinary civil injury, properly cognizable by the laws of the State, and presumably subject to redress by those laws until the contrary appears?
After giving to these questions all the consideration which their importance demands, we are forced to the conclusion that such an act of refusal has nothing to do with slavery or involuntary servitude, and that if it is violative of any right of the party, his redress is to be sought under the laws of the State; or if those laws are adverse to his rights and do not protect him, his remedy will be found in the corrective legislation which Congress has adopted, or may adopt, for counteracting the effect of State laws, or State action, prohibited by the Fourteenth Amendment. It would be running the slavery argument into the ground to make it apply to every act of discrimination which a person may see fit to make as to the guests he will entertain, or as to the people he will take into his coach or cab or car, or admit to his concert or theatre, or deal with in *25 other matters of intercourse or business. Innkeepers and public carriers, by the laws of all the States, so far as we are aware, are bound, to the extent of their facilities, to furnish proper accommodation to all unobjectionable persons who in good faith apply for them. If the laws themselves make any unjust discrimination, amenable to the prohibitions of the Fourteenth Amendment, Congress has full power to afford a remedy under that amendment and in accordance with it.
When a man has emerged from slavery, and by the aid of beneficent legislation has shaken off the inseparable concomitants of that state, there must be some stage in the progress of his elevation when he takes the rank of a mere citizen, and ceases to be the special favorite of the laws, and when his rights as a citizen, or a man, are to be protected in the ordinary modes by which other men's rights are protected. There were thousands of free colored people in this country before the abolition of slavery, enjoying all the essential rights of life, liberty and property the same as white citizens; yet no one, at that time, thought that it was any invasion of his personal status as a freeman because he was not admitted to all the privileges enjoyed by white citizens, or because he was subjected to discriminations in the enjoyment of accommodations in inns, public conveyances and places of amusement. Mere discriminations on account of race or color were not regarded as badges of slavery. If, since that time, the enjoyment of equal rights in all these respects has become established by constitutional enactment, it is not by force of the Thirteenth Amendment (which merely abolishes slavery), but by force of the Thirteenth and Fifteenth Amendments.
On the whole we are of opinion, that no countenance of authority for the passage of the law in question can be found in either the Thirteenth or Fourteenth Amendment of the Constitution; and no other ground of authority for its passage being suggested, it must necessarily be declared void, at least so far as its operation in the several States is concerned.
This conclusion disposes of the cases now under consideration. In the cases of the United States v. Michael Ryan, and of Richard A. Robinson and Wife v. The Memphis & Charleston *26 Railroad Company, the judgments must be affirmed. In the other cases, the answer to be given will be that the first and second sections of the act of Congress of March 1st, 1875, entitled "An Act to protect all citizens in their civil and legal rights," are unconstitutional and void, and that judgment should be rendered upon the several indictments in those cases accordingly.
And it is so ordered.
MR. JUSTICE HARLAN dissenting.
The opinion in these cases proceeds, it seems to me, upon grounds entirely too narrow and artificial. I cannot resist the conclusion that the substance and spirit of the recent amendments of the Constitution have been sacrificed by a subtle and ingenious verbal criticism. "It is not the words of the law but the internal sense of it that makes the law: the letter of the law is the body; the sense and reason of the law is the soul." Constitutional provisions, adopted in the interest of liberty, and for the purpose of securing, through national legislation, if need be, rights inhering in a state of freedom, and belonging to American citizenship, have been so construed as to defeat the ends the people desired to accomplish, which they attempted to accomplish, and which they supposed they had accomplished by changes in their fundamental law. By this I do not mean that the determination of these cases should have been materially controlled by considerations of mere expediency or policy. I mean only, in this form, to express an earnest conviction that the court has departed from the familiar rule requiring, in the interpretation of constitutional provisions, that full effect be given to the intent with which they were adopted.
The purpose of the first section of the act of Congress of March 1, 1875, was to prevent race discrimination in respect of the accommodations and facilities of inns, public conveyances, and places of public amusement. It does not assume to define the general conditions and limitations under which inns, public conveyances, and places of public amusement may be conducted, but only declares that such conditions and limitations, whatever they may be, shall not be applied so as to work a *27 discrimination solely because of race, color, or previous condition of servitude. The second section provides a penalty against any one denying, or aiding or inciting the denial, to any citizen, of that equality of right given by the first section, except for reasons by law applicable to citizens of every race or color and regardless of any previous condition of servitude.
There seems to be no substantial difference between my brethren and myself as to the purpose of Congress; for, they say that the essence of the law is, not to declare broadly that all persons shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities, and privileges of inns, public conveyances, and theatres; but that such enjoyment shall not be subject to conditions applicable only to citizens of a particular race or color, or who had been in a previous condition of servitude. The effect of the statute, the court says, is, that colored citizens, whether formerly slaves or not, and citizens of other races, shall have the same accommodations and privileges in all inns, public conveyances, and places of amusement as are enjoyed by white persons; and vice versa.
The court adjudges, I think erroneously, that Congress is without power, under either the Thirteenth or Fourteenth Amendment, to establish such regulations, and that the first and second sections of the statute are, in all their parts, unconstitutional and void.
Whether the legislative department of the government has transcended the limits of its constitutional powers, "is at all times," said this court in Fletcher v. Peck, 6 Cr. 128, "a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case... . The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." More recently in Sinking Fund Cases, 99 U.S., 718, we said: "It is our duty when required in the regular course of judicial proceedings, to declare an act of Congress void if not within the legislative power of the United States, but this declaration should never be made except in a clear case. Every possible presumption is *28 in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule."
Before considering the language and scope of these amendments it will be proper to recall the relations subsisting, prior to their adoption, between the national government and the institution of slavery, as indicated by the provisions of the Constitution, the legislation of Congress, and the decisions of this court. In this mode we may obtain keys with which to open the mind of the people, and discover the thought intended to be expressed.
In section 2 of article IV. of the Constitution it was provided that "no person held to service or labor in one State, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due." Under the authority of this clause Congress passed the Fugitive Slave Law of 1793, establishing a mode for the recovery of fugitive slaves, and prescribing a penalty against any person who should knowingly and willingly obstruct or hinder the master, his agent, or attorney, in seizing, arresting, and recovering the fugitive, or who should rescue the fugitive from him, or who should harbor or conceal the slave after notice that he was a fugitive.
In Prigg v. Commonwealth of Pennsylvania, 16 Pet. 539, this court had occasion to define the powers and duties of Congress in reference to fugitives from labor. Speaking by MR. JUSTICE STORY it laid down these propositions:
That a clause of the Constitution conferring a right should not be so construed as to make it shadowy, or unsubstantial, or leave the citizen without a remedial power adequate for its protection, when another construction equally accordant with the words and the sense in which they were used, would enforce and protect the right granted;
That Congress is not restricted to legislation for the execution *29 of its expressly granted powers; but, for the protection of rights guaranteed by the Constitution, may employ such means, not prohibited, as are necessary and proper, or such as are appropriate, to attain the ends proposed;
That the Constitution recognized the master's right of property in his fugitive slave, and, as incidental thereto, the right of seizing and recovering him, regardless of any State law, or regulation, or local custom whatsoever; and,
That the right of the master to have his slave, thus escaping, delivered up on claim, being guaranteed by the Constitution, the fair implication was that the national government was clothed with appropriate authority and functions to enforce it.
The court said: "The fundamental principle, applicable to all cases of this sort, would seem to be that when the end is required the means are given, and when the duty is enjoined the ability to perform it is contemplated to exist on the part of the functionary to whom it is entrusted." Again: "It would be a strange anomaly and forced construction to suppose that the national government meant to rely for the due fulfilment of its own proper duties, and the rights which it intended to secure, upon State legislation, and not upon that of the Union. A fortiori, it would be more objectionable to suppose that a power which was to be the same throughout the Union, should be confided to State sovereignty which could not rightfully act beyond its own territorial limits."
The act of 1793 was, upon these grounds, adjudged to be a constitutional exercise of the powers of Congress.
It is to be observed from the report of Priggs' case that Pennsylvania, by her attorney-general, pressed the argument that the obligation to surrender fugitive slaves was on the States and for the States, subject to the restriction that they should not pass laws or establish regulations liberating such fugitives; that the Constitution did not take from the States the right to determine the status of all persons within their respective jurisdictions; that it was for the State in which the alleged fugitive was found to determine, through her courts or in such modes as she prescribed, whether the person arrested was, in fact, a freeman or a fugitive slave; that the sole power *30 of the general government in the premises was, by judicial instrumentality, to restrain and correct, not to forbid and prevent in the absence of hostile State action; and that, for the general government to assume primary authority to legislate on the subject of fugitive slaves, to the exclusion of the States, would be a dangerous encroachment on State sovereignty. But to such suggestions this court turned a deaf ear, and adjudged that primary legislation by Congress to enforce the master's right was authorized by the Constitution.
We next come to the Fugitive Slave Act of 1850, the constitutionality of which rested, as did that of 1793, solely upon the implied power of Congress to enforce the master's rights. The provisions of that act were far in advance of previous legislation. They placed at the disposal of the master seeking to recover his fugitive slave, substantially the whole power of the nation. It invested commissioners, appointed under the act, with power to summon the posse comitatus for the enforcement of its provisions, and commanded all good citizens to assist in its prompt and efficient execution whenever their services were required as part of the posse comitatus. Without going into the details of that act, it is sufficient to say that Congress omitted from it nothing which the utmost ingenuity could suggest as essential to the successful enforcement of the master's claim to recover his fugitive slave. And this court, in Ableman v. Booth, 21 How. 506, adjudged it to be "in all of its provisions fully authorized by the Constitution of the United States."
The only other case, prior to the adoption of the recent amendments, to which reference will be made, is that of Dred Scott v. Sanford, 19 How. 399. That case was instituted in a circuit court of the United States by Dred Scott, claiming to be a citizen of Missouri, the defendant being a citizen of another State. Its object was to assert the title of himself and family to freedom. The defendant pleaded in abatement that Scott  being of African descent, whose ancestors, of pure African blood, were brought into this country and sold as slaves  was not a citizen. The only matter in issue, said the court, was whether the descendants of slaves thus imported *31 and sold, when they should be emancipated, or who were born of parents who had become free before their birth, are citizens of a State in the sense in which the word "citizen" is used in the Constitution of the United States.
In determining that question the court instituted an inquiry as to who were citizens of the several States at the adoption of the Constitution, and who, at that time, were recognized as the people whose rights and liberties had been violated by the British government. The result was a declaration, by this court, speaking by Chief Justice Taney, that the legislation and histories of the times, and the language used in the Declaration of Independence, showed "that neither the class of persons who had been imported as slaves, nor their descendants, whether they had become free or not, were then acknowledged as a part of the people, nor intended to be included in the general words used in that instrument;" that "they had for more than a century before been regarded as beings of an inferior race, and altogether unfit to associate with the white race, either in social or political relations, and so far inferior that they had no rights which the white man was bound to respect, and that the negro might justly and lawfully be reduced to slavery for his benefit;" that he was "bought and sold, and treated as an ordinary article of merchandise and traffic, whenever a profit could be made by it;" and, that "this opinion was at that time fixed and universal in the civilized portion of the white race. It was regarded as an axiom in morals as well as in politics, which no one thought of disputing, or supposed to be open to dispute; and men in every grade and position in society daily and habitually acted upon it in their private pursuits, as well as in matters of public concern, without for a moment doubting the correctness of this opinion."
The judgment of the court was that the words "people of the United States" and "citizens" meant the same thing, both describing "the political body who, according to our republican institutions, form the sovereignty and hold the power and conduct the government through their representatives;" that "they are what we familiarly call the `sovereign people,' and *32 every citizen is one of this people and a constituent member of this sovereignty;" but, that the class of persons described in the plea in abatement did not compose a portion of this people, were not "included, and were not intended to be included, under the word `citizens' in the Constitution;" that, therefore, they could "claim none of the rights and privileges which that instrument provides for and secures to citizens of the United States;" that, "on the contrary, they were at that time considered as a subordinate and inferior class of beings, who had been subjugated by the dominant race, and, whether emancipated or not, yet remained subject to their authority, and had no rights or privileges but such as those who held the power and the government might choose to grant them."
Such were the relations which formerly existed between the government, whether national or state, and the descendants, whether free or in bondage, of those of African blood, who had been imported into this country and sold as slaves.
The first section of the Thirteenth Amendment provides that "neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." Its second section declares that "Congress shall have power to enforce this article by appropriate legislation." This amendment was followed by the Civil Rights Act of April 9, 1866, which, among other things, provided that "all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States." 14 Stat. 27. The power of Congress, in this mode, to elevate the enfranchised race to national citizenship, was maintained by the supporters of the act of 1866 to be as full and complete as its power, by general statute, to make the children, being of full age, of persons naturalized in this country, citizens of the United States without going through the process of naturalization. The act of 1866, in this respect, was also likened to that of 1843, in which Congress declared "that the Stockbridge tribe of Indians, and each and every one of them, shall be deemed to be and are hereby declared to be, citizens of the United States to *33 all intents and purposes, and shall be entitled to all the rights, privileges, and immunities of such citizens, and shall in all respects be subject to the laws of the United States." If the act of 1866 was valid in conferring national citizenship upon all embraced by its terms, then the colored race, enfranchised by the Thirteenth Amendment, became citizens of the United States prior to the adoption of the Fourteenth Amendment. But, in the view which I take of the present case, it is not necessary to examine this question.
The terms of the Thirteenth Amendment are absolute and universal. They embrace every race which then was, or might thereafter be, within the United States. No race, as such, can be excluded from the benefits or rights thereby conferred. Yet, it is historically true that that amendment was suggested by the condition, in this country, of that race which had been declared, by this court, to have had  according to the opinion entertained by the most civilized portion of the white race, at the time of the adoption of the Constitution  "no rights which the white man was bound to respect," none of the privileges or immunities secured by that instrument to citizens of the United States. It had reference, in a peculiar sense, to a people which (although the larger part of them were in slavery) had been invited by an act of Congress to aid in saving from overthrow a government which, theretofore, by all of its departments, had treated them as an inferior race, with no legal rights or privileges except such as the white race might choose to grant them.
These are the circumstances under which the Thirteenth Amendment was proposed for adoption. They are now recalled only that we may better understand what was in the minds of the people when that amendment was considered, and what were the mischiefs to be remedied and the grievances to be redressed by its adoption.
We have seen that the power of Congress, by legislation, to enforce the master's right to have his slave delivered up on claim was implied from the recognition of that right in the national Constitution. But the power conferred by the Thirteenth Amendment does not rest upon implication or *34 inference. Those who framed it were not ignorant of the discussion, covering many years of our country's history, as to the constitutional power of Congress to enact the Fugitive Slave Laws of 1793 and 1850. When, therefore, it was determined, by a change in the fundamental law, to uproot the institution of slavery wherever it existed in the land, and to establish universal freedom, there was a fixed purpose to place the authority of Congress in the premises beyond the possibility of a doubt. Therefore, ex industria, power to enforce the Thirteenth Amendment, by appropriate legislation, was expressly granted. Legislation for that purpose, my brethren concede, may be direct and primary. But to what specific ends may it be directed? This court has uniformly held that the national government has the power, whether expressly given or not, to secure and protect rights conferred or guaranteed by the Constitution. United States v. Reese, 92 U.S. 214; Strauder v. West Virginia, 100 U.S. 303. That doctrine ought not now to be abandoned when the inquiry is not as to an implied power to protect the master's rights, but what may Congress, under powers expressly granted, do for the protection of freedom and the rights necessarily inhering in a state of freedom.
The Thirteenth Amendment, it is conceded, did something more than to prohibit slavery as an institution, resting upon distinctions of race, and upheld by positive law. My brethren admit that it established and decreed universal civil freedom throughout the United States. But did the freedom thus established involve nothing more than exemption from actual slavery? Was nothing more intended than to forbid one man from owning another as property? Was it the purpose of the nation simply to destroy the institution, and then remit the race, theretofore held in bondage, to the several States for such protection, in their civil rights, necessarily growing out of freedom, as those States, in their discretion, might choose to provide? Were the States against whose protest the institution was destroyed, to be left free, so far as national interference was concerned, to make or allow discriminations against that race, as such, in the enjoyment of those fundamental rights which by universal concession, inhere in a state of freedom? *35 Had the Thirteenth Amendment stopped with the sweeping declaration, in its first section, against the existence of slavery and involuntary servitude, except for crime, Congress would have had the power, by implication, according to the doctrines of Prigg v. Commonwealth of Pennsylvania, repeated in Strauder v. West Virginia, to protect the freedom established, and consequently, to secure the enjoyment of such civil rights as were fundamental in freedom. That it can exert its authority to that extent is made clear, and was intended to be made clear, by the express grant of power contained in the second section of the Amendment.
That there are burdens and disabilities which constitute badges of slavery and servitude, and that the power to enforce by appropriate legislation the Thirteenth Amendment may be exerted by legislation of a direct and primary character, for the eradication, not simply of the institution, but of its badges and incidents, are propositions which ought to be deemed indisputable. They lie at the foundation of the Civil Rights Act of 1866. Whether that act was authorized by the Thirteenth Amendment alone, without the support which it subsequently received from the Fourteenth Amendment, after the adoption of which it was re-enacted with some additions, my brethren do not consider it necessary to inquire. But I submit, with all respect to them, that its constitutionality is conclusively shown by their opinion. They admit, as I have said, that the Thirteenth Amendment established freedom; that there are burdens and disabilities, the necessary incidents of slavery, which constitute its substance and visible form; that Congress, by the act of 1866, passed in view of the Thirteenth Amendment, before the Fourteenth was adopted, undertook to remove certain burdens and disabilities, the necessary incidents of slavery, and to secure to all citizens of every race and color, and without regard to previous servitude, those fundamental rights which are the essence of civil freedom, namely, the same right to make and enfore contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell, and convey property as is enjoyed by white citizens; that under the Thirteenth Amendment, Congress has to do with slavery and *36 its incidents; and that legislation, so far as necessary or proper to eradicate all forms and incidents of slavery and involuntary servitude, may be direct and primary, operating upon the acts of individuals, whether sanctioned by State legislation or not. These propositions being conceded, it is impossible, as it seems to me, to question the constitutional validity of the Civil Rights Act of 1866. I do not contend that the Thirteenth Amendment invests Congress with authority, by legislation, to define and regulate the entire body of the civil rights which citizens enjoy, or may enjoy, in the several States. But I hold that since slavery, as the court has repeatedly declared, Slaughter-house Cases, 16 Wall. 36; Strauder v. West Virginia, 100 U.S. 303, was the moving or principal cause of the adoption of that amendment, and since that institution rested wholly upon the inferiority, as a race, of those held in bondage, their freedom necessarily involved immunity from, and protection against, all discrimination against them, because of their race, in respect of such civil rights as belong to freemen of other races. Congress, therefore, under its express power to enforce that amendment, by appropriate legislation, may enact laws to protect that people against the deprivation, because of their race, of any civil rights granted to other freemen in the same State; and such legislation may be of a direct and primary character, operating upon States, their officers and agents, and, also, upon, at least, such individuals and corporations as exercise public functions and wield power and authority under the State.
To test the correctness of this position, let us suppose that, prior to the adoption of the Fourteenth Amendment, a State had passed a statute denying to freemen of African descent, resident within its limits, the same right which was accorded to white persons, of making and enforcing contracts, and of inheriting, purchasing, leasing, selling and conveying property; or a statute subjecting colored people to severer punishment for particular offences than was prescribed for white persons, or excluding that race from the benefit of the laws exempting homesteads from execution. Recall the legislation of 1865-6 in some of the States, of which this court, in the Slaughter-House *37 Cases, said, that it imposed upon the colored race onerous disabilities and burdens; curtailed their rights in the pursuit of life, liberty and property to such an extent that their freedom was of little value; forbade them to appear in the towns in any other character than menial servants; required them to reside on and cultivate the soil, without the right to purchase or own it; excluded them from many occupations of gain; and denied them the privilege of giving testimony in the courts where a white man was a party. 16 Wall. 57. Can there be any doubt that all such enactments might have been reached by direct legislation upon the part of Congress under its express power to enforce the Thirteenth Amendment? Would any court have hesitated to declare that such legislation imposed badges of servitude in conflict with the civil freedom ordained by that amendment? That it would have been also in conflict with the Fourteenth Amendment, because inconsistent with the fundamental rights of American citizenship, does not prove that it would have been consistent with the Thirteenth Amendment.
What has been said is sufficient to show that the power of Congress under the Thirteenth Amendment is not necessarily restricted to legislation against slavery as an institution upheld by positive law, but may be exerted to the extent, at least, of protecting the liberated race against discrimination, in respect of legal rights belonging to freemen, where such discrimination is based upon race.
It remains now to inquire what are the legal rights of colored persons in respect of the accommodations, privileges and facilities of public conveyances, inns and places of public amusement?
First, as to public conveyances on land and water. In New Jersey Steam Navigation Co. v. Merchants' Bank, 6 How. 344, this court, speaking by Mr. Justice Nelson, said that a common carrier is "in the exercise of a sort of public office, and has public duties to perform, from which he should not be permitted to exonerate himself without the assent of the parties concerned." To the same effect is Munn v. Illinois, 94 U.S. 113. In Olcott v. Supervisors, 16 Wall. 678, it was ruled that *38 railroads are public highways, established by authority of the State for the public use; that they are none the less public highways, becaused controlled and owned by private corporations; that it is a part of the function of government to make and maintain highways for the convenience of the public; that no matter who is the agent, or what is the agency, the function performed is that of the State; that although the owners may be private companies, they may be compelled to permit the public to use these works in the manner in which they can be used; that, upon these grounds alone, have the courts sustained the investiture of railroad corporations with the State's right of eminent domain, or the right of municipal corporations, under legislative authority, to assess, levy and collect taxes to aid in the construction of railroads. So in Township of Queensbury v. Culver, 19 Wall. 83, it was said that a municipal subscription of railroad stock was in aid of the construction and maintenance of a public highway, and for the promotion of a public use. Again, in Township of Pine Grove v. Talcott, 19 Wall. 666: "Though the corporation [railroad] was private, its work was public, as much so as if it were to be constructed by the State." To the like effect are numerous adjudications in this and the State courts with which the profession is familiar. The Supreme Judicial Court of Massachusetts in Inhabitants of Worcester v. The Western R.R. Corporation, 4 Met. 564, said in reference to a railroad:
"The establishment of that great thoroughfare is regarded as a public work, established by public authority, intended for the public use and benefit, the use of which is secured to the whole community, and constitutes, therefore, like a canal, turnpike, or highway, a public easement... . It is true that the real and personal property, necessary to the establishment and management of the railroad, is vested in the corporation; but it is in trust for the public." In Erie, Etc., R.R. Co. v. Casey, 26 Penn. St. 287, the court, referring to an act repealing the charter of a railroad, and under which the State took possession of the road, said: "It is a public highway, solemnly devoted to public use. When the lands were taken it was for such use, or they could not have been taken at all... . Railroads established *39 upon land taken by the right of eminent domain by authority of the commonwealth, created by her laws as thoroughfares for commerce, are her highways. No corporation has property in them, though it may have franchises annexed to and exercisable within them."
In many courts it has been held that because of the public interest in such a corporation the land of a railroad company cannot be levied on and sold under execution by a creditor. The sum of the adjudged cases is that a railroad corporation is a governmental agency, created primarily for public purposes, and subject to be controlled for the public benefit. Upon this ground the State, when unfettered by contract, may regulate, in its discretion, the rates of fares of passengers and freight. And upon this ground, too, the State may regulate the entire management of railroads in all matters affecting the convenience and safety of the public; as, for example, by regulating speed, compelling stops of prescribed length at stations, and prohibiting discriminations and favoritism. If the corporation neglect or refuse to discharge its duties to the public, it may be coerced to do so by appropriate proceedings in the name or in behalf of the State.
Such being the relations these corporations hold to the public, it would seem that the right of a colored person to use an improved public highway, upon the terms accorded to freemen of other races, is as fundamental, in the state of freedom established in this country, as are any of the rights which my brethren concede to be so far fundamental as to be deemed the essence of civil freedom. "Personal liberty consists," says Blackstone, "in the power of locomotion, of changing situation, or removing one's person to whatever places one's own inclination may direct, without restraint, unless by due course of law." But of what value is this right of locomotion, if it may be clogged by such burdens as Congress intended by the act of 1875 to remove? They are burdens which lay at the very foundation of the institution of slavery as it once existed. They are not to be sustained, except upon the assumption that there is, in this land of universal liberty, a class which may still be discriminated against, even in respect of rights of a character *40 so necessary and supreme, that, deprived of their enjoyment in common with others, a freeman is not only branded as one inferior and infected, but, in the competitions of life, is robbed of some of the most essential means of existence; and all this solely because they belong to a particular race which the nation has liberated. The Thirteenth Amendment alone obliterated the race line, so far as all rights fundamental in a state of freedom are concerned.
Second, as to inns. The same general observations which have been made as to railroads are applicable to inns. The word `inn' has a technical legal signification. It means, in the act of 1875, just what it meant at common law. A mere private boarding-house is not an inn, nor is its keeper subject to the responsibilities, or entitled to the privileges of a common innkeeper. "To constitute one an innkeeper, within the legal force of that term, he must keep a house of entertainment or lodging for all travellers or wayfarers who might choose to accept the same, being of good character or conduct." Redfield on Carriers, etc., § 575. Says Judge Story:
"An innkeeper may be defined to be the keeper of a common inn for the lodging and entertainment of travellers and passengers, their horses and attendants. An innkeeper is bound to take in all travellers and wayfaring persons, and to entertain them, if he can accommodate them, for a reasonable compensation; and he must guard their goods with proper diligence... . If an innkeeper improperly refuses to receive or provide for a guest, he is liable to be indicted therefor... . They (carriers of passengers) are no more at liberty to refuse a passenger, if they have sufficient room and accommodations, than an innkeeper is to refuse suitable room and accommodations to a guest." Story on Bailments, §§ 475-6.
In Rex v. Ivens, 7 Carrington & Payne, 213, 32 E.C.L. 495, the court, speaking by Mr. Justice Coleridge, said:
"An indictment lies against an innkeeper who refuses to receive a guest, he having at the time room in his house; and either the price of the guest's entertainment being tendered to him, or such circumstances occurring as will dispense with that *41 tender. This law is founded in good sense. The innkeeper is not to select his guests. He has no right to say to one, you shall come to my inn, and to another you shall not, as every one coming and conducting himself in a proper manner has a right to be received; and for this purpose innkeepers are a sort of public servants, they having in return a kind of privilege of entertaining travellers and supplying them with what they want."
These authorities are sufficient to show that a keeper of an inn is in the exercise of a quasi public employment. The law gives him special privileges and he is charged with certain duties and responsibilities to the public. The public nature of his employment forbids him from discriminating against any person asking admission as a guest on account of the race or color of that person.
Third. As to places of public amusement. It may be argued that the managers of such places have no duties to perform with which the public are, in any legal sense, concerned, or with which the public have any right to interfere; and, that the exclusion of a black man from a place of public amusement, on account of his race, or the denial to him, on that ground, of equal accommodations at such places, violates no legal right for the vindication of which he may invoke the aid of the courts. My answer is, that places of public amusement, within the meaning of the act of 1875, are such as are established and maintained under direct license of the law. The authority to establish and maintain them comes from the public. The colored race is a part of that public. The local government granting the license represents them as well as all other races within its jurisdiction. A license from the public to establish a place of public amusement, imports, in law, equality of right, at such places, among all the members of that public. This must be so, unless it be  which I deny  that the common municipal government of all the people may, in the exertion of its powers, conferred for the benefit of all, discriminate or authorize discrimination against a particular race, solely because of its former condition of servitude.
I also submit, whether it can be said  in view of the doctrines of this court as announced in Munn v. State of Illinois, *42 94 U.S. 113 and reaffirmed in Peik v. Chicago & N.W. Railway Co., 94 U.S. 164  that the management of places of public amusement is a purely private matter, with which government has no rightful concern? In the Munn case the question was whether the State of Illinois could fix, by law, the maximum of charges for the storage of grain in certain warehouses in that State  the private property of individual citizens. After quoting a remark attributed to Lord Chief Justice Hale, to the effect that when private property is "affected with a public interest it ceases to be juris privati only," the court says:
"Property does become clothed with a public interest when used in a manner to make it of public consequence and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use, but, so long as he maintains the use, he must submit to the control."
The doctrines of Munn v. Illinois have never been modified by this court, and I am justified, upon the authority of that case, in saying that places of public amusement, conducted under the authority of the law, are clothed with a public interest, because used in a manner to make them of public consequence and to affect the community at large. The law may therefore regulate, to some extent, the mode in which they shall be conducted, and, consequently, the public have rights in respect of such places, which may be vindicated by the law. It is consequently not a matter purely of private concern.
Congress has not, in these matters, entered the domain of State control and supervision. It does not, as I have said, assume to prescribe the general conditions and limitations under which inns, public conveyances, and places of public amusement, shall be conducted or managed. It simply declares, in effect, that since the nation has established universal freedom in this country, for all time, there shall be no discrimination, based merely upon race or color, in respect of the accommodations *43 and advantages of public conveyances, inns, and places of public amusement.
I am of the opinion that such discrimination practised by corporations and individuals in the exercise of their public or quasi-public functions is a badge of servitude the imposition of which Congress may prevent under its power, by appropriate legislation, to enforce the Thirteenth Amendment; and, consequently, without reference to its enlarged power under the Fourteenth Amendment, the act of March 1, 1875, is not, in my judgment, repugnant to the Constitution.
It remains now to consider these cases with reference to the power Congress has possessed since the adoption of the Fourteenth Amendment. Much that has been said as to the power of Congress under the Thirteenth Amendment is applicable to this branch of the discussion, and will not be repeated.
Before the adoption of the recent amendments, it had become, as we have seen, the established doctrine of this court that negroes, whose ancestors had been imported and sold as slaves, could not become citizens of a State, or even of the United States, with the rights and privileges guaranteed to citizens by the national Constitution; further, that one might have all the rights and privileges of a citizen of a State without being a citizen in the sense in which that word was used in the national Constitution, and without being entitled to the privileges and immunities of citizens of the several States. Still, further, between the adoption of the Thirteenth Amendment and the proposal by Congress of the Fourteenth Amendment, on June 16, 1866, the statute books of several of the States, as we have seen, had become loaded down with enactments which, under the guise of Apprentice, Vagrant, and Contract regulations, sought to keep the colored race in a condition, practically, of servitude. It was openly announced that whatever might be the rights which persons of that race had, as freemen, under the guarantees of the national Constitution, they could not become citizens of a State, with the privileges belonging to citizens, except by the consent of such State; consequently, that their civil rights, as citizens of the State, depended entirely upon State legislation. To meet this new peril to the black race, that the *44 purposes of the nation might not be doubted or defeated, and by way of further enlargement of the power of Congress, the Fourteenth Amendment was proposed for adoption.
Remembering that this court, in the Slaughter-House Cases, declared that the one pervading purpose found in all the recent amendments, lying at the foundation of each, and without which none of them would have been suggested  was "the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppression of those who had formerly exercised unlimited dominion over him"  that each amendment was addressed primarily to the grievances of that race  let us proceed to consider the language of the Fourteenth Amendment.
Its first and fifth sections are in these words:
"SEC. 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

* * * * * *
"SEC. 5. That Congress shall have power to enforce, by appropriate legislation, the provisions of this article."
It was adjudged in Strauder v. West Virginia, 100 U.S. 303, and Ex parte Virginia, 100 U.S. 339, and my brethren concede, that positive rights and privileges were intended to be secured, and are in fact secured, by the Fourteenth Amendment.
But when, under what circumstances, and to what extent, may Congress, by means of legislation, exert its power to enforce the provisions of this amendment? The theory of the opinion of the majority of the court  the foundation upon which their reasoning seems to rest  is, that the general government cannot, in advance of hostile State laws or hostile State *45 proceedings, actively interfere for the protection of any of the rights, privileges, and immunities secured by the Fourteenth Amendment. It is said that such rights, privileges, and immunities are secured by way of prohibition against State laws and State proceedings affecting such rights and privileges, and by power given to Congress to legislate for the purpose of carrying such prohibition into effect; also, that congressional legislation must necessarily be predicated upon such supposed State laws or State proceedings, and be directed to the correction of their operation and effect.
In illustration of its position, the court refers to the clause of the Constitution forbidding the passage by a State of any law impairing the obligation of contracts. That clause does not, I submit, furnish a proper illustration of the scope and effect of the fifth section of the Fourteenth Amendment. No express power is given Congress to enforce, by primary direct legislation, the prohibition upon State laws impairing the obligation of contracts. Authority is, indeed, conferred to enact all necessary and proper laws for carrying into execution the enumerated powers of Congress and all other powers vested by the Constitution in the government of the United States or in any department or officer thereof. And, as heretofore shown, there is also, by necessary implication, power in Congress, by legislation, to protect a right derived from the national Constitution. But a prohibition upon a State is not a power in Congress or in the national government. It is simply a denial of power to the State. And the only mode in which the inhibition upon State laws impairing the obligation of contracts can be enforced, is, indirectly, through the courts, in suits where the parties raise some question as to the constitutional validity of such laws. The judicial power of the United States extends to such suits for the reason that they are suits arising under the Constitution. The Fourteenth Amendment presents the first instance in our history of the investiture of Congress with affirmative power, by legislation, to enforce an express prohibition upon the States. It is not said that the judicial power of the nation may be exerted for the enforcement of that amendment. No enlargement of the judicial power was required, for it is clear *46 that had the fifth section of the Fourteenth Amendment been entirely omitted, the judiciary could have stricken down all State laws and nullified all State proceedings in hostility to rights and privileges secured or recognized by that amendment. The power given is, in terms, by congressional legislation, to enforce the provisions of the amendment.
The assumption that this amendment consists wholly of prohibitions upon State laws and State proceedings in hostility to its provisions, is unauthorized by its language. The first clause of the first section  "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the State wherein they reside"  is of a distinctly affirmative character. In its application to the colored race, previously liberated, it created and granted, as well citizenship of the United States, as citizenship of the State in which they respectively resided. It introduced all of that race, whose ancestors had been imported and sold as slaves, at once, into the political community known as the "People of the United States." They became, instantly, citizens of the United States, and of their respective States. Further, they were brought, by this supreme act of the nation, within the direct operation of that provision of the Constitution which declares that "the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." Art. 4, § 2.
The citizenship thus acquired, by that race, in virtue of an affirmative grant from the nation, may be protected, not alone by the judicial branch of the government, but by congressional legislation of a primary direct character; this, because the power of Congress is not restricted to the enforcement of prohibitions upon State laws or State action. It is, in terms distinct and positive, to enforce "the provisions of this article" of amendment; not simply those of a prohibitive character, but the provisions  all of the provisions  affirmative and prohibitive, of the amendment. It is, therefore, a grave misconception to suppose that the fifth section of the amendment has reference exclusively to express prohibitions upon State laws or State action. If any right was created by that amendment, the *47 grant of power, through appropriate legislation, to enforce its provisions, authorizes Congress, by means of legislation, operating throughout the entire Union, to guard, secure, and protect that right.
It is, therefore, an essential inquiry what, if any, right, privilege or immunity was given, by the nation, to colored persons, when they were made citizens of the State in which they reside? Did the constitutional grant of State citizenship to that race, of its own force, invest them with any rights, privileges and immunities whatever? That they became entitled, upon the adoption of the Fourteenth Amendment, "to all privileges and immunities of citizens in the several States," within the meaning of section 2 of article 4 of the Constitution, no one, I suppose, will for a moment question. What are the privileges and immunities to which, by that clause of the Constitution, they became entitled? To this it may be answered, generally, upon the authority of the adjudged cases, that they are those which are fundamental in citizenship in a free republican government, such as are "common to the citizens in the latter States under their constitutions and laws by virtue of their being citizens." Of that provision it has been said, with the approval of this court, that no other one in the Constitution has tended so strongly to constitute the citizens of the United States one people. Ward v. Maryland, 12 Wall. 418; Corfield v. Coryell, 4 Wash. C.C. 371; Paul v. Virginia, 8 Wall. 168; Slaughter-house Cases, 16 id. 36.
Although this court has wisely forborne any attempt, by a comprehensive definition, to indicate all of the privileges and immunities to which the citizen of a State is entitled, of right, when within the jurisdiction of other States, I hazard nothing, in view of former adjudications, in saying that no State can sustain her denial to colored citizens of other States, while within her limits, of privileges or immunities, fundamental in republican citizenship, upon the ground that she accords such privileges and immunities only to her white citizens and withholds them from her colored citizens. The colored citizens of other States, within the jurisdiction of that State, could claim, in virtue of section 2 of article 4 of the Constitution, every privilege and immunity *48 which that State secures to her white citizens. Otherwise, it would be in the power of any State, by discriminating class legislation against its own citizens of a particular race or color, to withhold from citizens of other States, belonging to that proscribed race, when within her limits, privileges and immunities of the character regarded by all courts as fundamental in citizenship; and that, too, when the constitutional guaranty is that the citizens of each State shall be entitled to "all privileges and immunities of citizens of the several States." No State may, by discrimination against a portion of its own citizens of a particular race, in respect of privileges and immunities fundamental in citizenship, impair the constitutional right of citizens of other States, of whatever race, to enjoy in that State all such privileges and immunities as are there accorded to her most favored citizens. A colored citizen of Ohio or Indiana, while in the jurisdiction of Tennessee, is entitled to enjoy any privilege or immunity, fundamental in citizenship, which is given to citizens of the white race in the latter State. It is not to be supposed that any one will controvert this proposition.
But what was secured to colored citizens of the United States  as between them and their respective States  by the national grant to them of State citizenship? With what rights, privileges, or immunities did this grant invest them? There is one, if there be no other  exemption from race discrimination in respect of any civil right belonging to citizens of the white race in the same State. That, surely, is their constitutional privilege when within the jurisdiction of other States. And such must be their constitutional right, in their own State, unless the recent amendments be splendid baubles, thrown out to delude those who deserved fair and generous treatment at the hands of the nation. Citizenship in this country necessarily imports at least equality of civil rights among citizens of every race in the same State. It is fundamental in American citizenship that, in respect of such rights, there shall be no discrimination by the State, or its officers, or by individuals or corporations exercising public functions or authority, against any citizen because of his race or previous condition of servitude. In United States v. Cruikshank, 92 U.S. 542, it was said at page 555, that the *49 rights of life and personal liberty are natural rights of man, and that "the equality of the rights of citizens is a principle of republicanism." And in Ex parte Virginia, 100 U.S. 334, the emphatic language of this court is that "one great purpose of these amendments was to raise the colored race from that condition of inferiority and servitude in which most of them had previously stood, into perfect equality of civil rights with all other persons within the jurisdiction of the States." So, in Strauder v. West Virginia, 100 U.S. 306, the court, alluding to the Fourteenth Amendment, said: "This is one of a series of constitutional provisions having a common purpose, namely, securing to a race recently emancipated, a race that through many generations had been held in slavery, all the civil rights that the superior race enjoy." Again, in Neal v. Delaware, 103 U.S. 386, it was ruled that this amendment was designed, primarily, "to secure to the colored race, thereby invested with the rights, privileges, and responsibilities of citizenship, the enjoyment of all the civil rights that, under the law, are enjoyed by white persons."
The language of this court with reference to the Fifteenth Amendment, adds to the force of this view. In United States v. Cruikshank, it was said: "In United States v. Reese, 92 U.S. 214, we held that the Fifteenth Amendment has invested the citizens of the United States with a new constitutional right, which is exemption from discrimination in the exercise of the elective franchise, on account of race, color, or previous condition of servitude. From this it appears that the right of suffrage is not a necessary attribute of national citizenship, but that exemption from discrimination in the exercise of that right on account of race, &c., is. The right to vote in the States comes from the States; but the right of exemption from the prohibited discrimination comes from the United States. The first has not been granted or secured by the Constitution of the United States, but the last has been."
Here, in language at once clear and forcible, is stated the principle for which I contend. It can scarcely be claimed that exemption from race discrimination, in respect of civil rights, against those to whom State citizenship was granted by the *50 nation, is any less, for the colored race, a new constitutional right, derived from and secured by the national Constitution, than is exemption from such discrimination in the exercise of the elective franchise. It cannot be that the latter is an attribute of national citizenship, while the other is not essential in national citizenship, or fundamental in State citizenship.
If, then, exemption from discrimination, in respect of civil rights, is a new constitutional right, secured by the grant of State citizenship to colored citizens of the United States  and I do not see how this can now be questioned  why may not the nation, by means of its own legislation of a primary direct character, guard, protect and enforce that right? It is a right and privilege which the nation conferred. It did not come from the States in which those colored citizens reside. It has been the established doctrine of this court during all its history, accepted as essential to the national supremacy, that Congress, in the absence of a positive delegation of power to the State legislatures, may, by its own legislation, enforce and protect any right derived from or created by the national Constitution. It was so declared in Prigg v. Commonwealth of Pennsylvania. It was reiterated in United States v. Reese, 92 U.S. 214, where the court said that "rights and immunities created by and dependent upon the Constitution of the United States can be protected by Congress. The form and manner of the protection may be such as Congress, in the legitimate exercise of its discretion, shall provide. These may be varied to meet the necessities of the particular right to be protected." It was distinctly reaffirmed in Strauder v. West Virginia, 100 U.S. 310, where we said that "a right or immunity created by the Constitution or only guaranteed by it, even without any express delegation of power, may be protected by Congress." How then can it be claimed in view of the declarations of this court in former cases, that exemption of colored citizens, within their States, from race discrimination, in respect of the civil rights of citizens, is not an immunity created or derived from the national Constitution?
This court has always given a broad and liberal construction to the Constitution, so as to enable Congress, by legislation, to *51 enforce rights secured by that instrument. The legislation which Congress may enact, in execution of its power to enforce the provisions of this amendment, is such as may be appropriate to protect the right granted. The word appropriate was undoubtedly used with reference to its meaning, as established by repeated decisions of this court. Under given circumstances, that which the court characterizes as corrective legislation might be deemed by Congress appropriate and entirely sufficient. Under other circumstances primary direct legislation may be required. But it is for Congress, not the judiciary, to say that legislation is appropriate  that is  best adapted to the end to be attained. The judiciary may not, with safety to our institutions, enter the domain of legislative discretion, and dictate the means which Congress shall employ in the exercise of its granted powers. That would be sheer usurpation of the functions of a co-ordinate department, which, if often repeated, and permanently acquiesced in, would work a radical change in our system of government. In United States v. Fisher, 2 Cr. 358, the court said that "Congress must possess the choice of means, and must be empowered to use any means which are in fact conducive to the exercise of a power granted by the Constitution." "The sound construction of the Constitution," said Chief Justice Marshall, "must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional." McCulloch v. Maryland, 4 Wh. 421.
Must these rules of construction be now abandoned? Are the powers of the national legislature to be restrained in proportion as the rights and privileges, derived from the nation, are valuable? Are constitutional provisions, enacted to secure the dearest rights of freemen and citizens, to be subjected to that rule of construction, applicable to private instruments, *52 which requires that the words to be interpreted must be taken most strongly against those who employ them? Or, shall it be remembered that "a constitution of government, founded by the people for themselves and their posterity, and for objects of the most momentous nature  for perpetual union, for the establishment of justice, for the general welfare, and for a perpetuation of the blessings of liberty  necessarily requires that every interpretation of its powers should have a constant reference to these objects? No interpretation of the words in which those powers are granted can be a sound one, which narrows down their ordinary import so as to defeat those objects." 1 Story Const. § 422.
The opinion of the court, as I. have said, proceeds upon the ground that the power of Congress to legislate for the protection of the rights and privileges secured by the Fourteenth Amendment cannot be brought into activity except with the view, and as it may become necessary, to correct and annul State laws and State proceedings in hostility to such rights and privileges. In the absence of State laws or State action adverse to such rights and privileges, the nation may not actively interfere for their protection and security, even against corporations and individuals exercising public or quasi public functions. Such I understand to be the position of my brethren. If the grant to colored citizens of the United States of citizenship in their respective States, imports exemption from race discrimination, in their States, in respect of such civil rights as belong to citizenship, then, to hold that the amendment remits that right to the States for their protection, primarily, and stays the hands of the nation, until it is assailed by State laws or State proceedings, is to adjudge that the amendment, so far from enlarging the powers of Congress  as we have heretofore said it did  not only curtails them, but reverses the policy which the general government has pursued from its very organization. Such an interpretation of the amendment is a denial to Congress of the power, by appropriate legislation, to enforce one of its provisions. In view of the circumstances under which the recent amendments were incorporated into the Constitution, and especially in view of the peculiar character of the new *53 rights they created and secured, it ought not to be presumed that the general government has abdicated its authority, by national legislation, direct and primary in its character, to guard and protect privileges and immunities secured by that instrument. Such an interpretation of the Constitution ought not to be accepted if it be possible to avoid it. Its acceptance would lead to this anomalous result: that whereas, prior to the amendments, Congress, with the sanction of this court, passed the most stringent laws  operating directly and primarily upon States and their officers and agents, as well as upon individuals  in vindication of slavery and the right of the master, it may not now, by legislation of a like primary and direct character, guard, protect, and secure the freedom established, and the most essential right of the citizenship granted, by the constitutional amendments. With all respect for the opinion of others, I insist that the national legislature may, without transcending the limits of the Constitution, do for human liberty and the fundamental rights of American citizenship, what it did, with the sanction of this court, for the protection of slavery and the rights of the masters of fugitive slaves. If fugitive slave laws, providing modes and prescribing penalties, whereby the master could seize and recover his fugitive slave, were legitimate exercises of an implied power to protect and enforce a right recognized by the Constitution, why shall the hands of Congress be tied, so that  under an express power, by appropriate legislation, to enforce a constitutional provision granting citizenship  it may not, by means of direct legislation, bring the whole power of this nation to bear upon States and their officers, and upon such individuals and corporations exercising public functions as assume to abridge, impair, or deny rights confessedly secured by the supreme law of the land?
It does not seem to me that the fact that, by the second clause of the first section of the Fourteenth Amendment, the States are expressly prohibited from making or enforcing laws abridging the privileges and immunities of citizens of the United States, furnishes any sufficient reason for holding or maintaining that the amendment was intended to deny Congress the power, by general, primary, and direct legislation, of *54 protecting citizens of the several States, being also citizens of the United States, against all discrimination, in respect of their rights as citizens, which is founded on race, color, or previous condition of servitude.
Such an interpretation of the amendment is plainly repugnant to its fifth section, conferring upon Congress power, by appropriate legislation, to enforce not merely the provisions containing prohibitions upon the States, but all of the provisions of the amendment, including the provisions, express and implied, in the first clause of the first section of the article granting citizenship. This alone is sufficient for holding that Congress is not restricted to the enactment of laws adapted to counteract and redress the operation of State legislation, or the action of State officers, of the character prohibited by the amendment. It was perfectly well known that the great danger to the equal enjoyment by citizens of their rights, as citizens, was to be apprehended not altogether from unfriendly State legislation, but from the hostile action of corporations and individuals in the States. And it is to be presumed that it was intended, by that section, to clothe Congress with power and authority to meet that danger. If the rights intended to be secured by the act of 1875 are such as belong to the citizen, in common or equally with other citizens in the same State, then it is not to be denied that such legislation is peculiarly appropriate to the end which Congress is authorized to accomplish, viz., to protect the citizen, in respect of such rights, against discrimination on account of his race. Recurring to the specific prohibition in the Fourteenth Amendment upon the making or enforcing of State laws abridging the privileges of citizens of the United States, I remark that if, as held in the Slaughter-House Cases, the privileges here referred to were those which belonged to citizenship of the United States, as distinguished from those belonging to State citizenship, it was impossible for any State prior to the adoption of that amendment to have enforced laws of that character. The judiciary could have annulled all such legislation under the provision that the Constitution shall be the supreme law of the land, anything in the constitution or laws of any State to the contrary notwithstanding. The States were *55 already under an implied prohibition not to abridge any privilege or immunity belonging to citizens of the United States as such. Consequently, the prohibition upon State laws in hostility to rights belonging to citizens of the United States, was intended  in view of the introduction into the body of citizens of a race formerly denied the essential rights of citizenship  only as an express limitation on the powers of the States, and was not intended to diminish, in the slightest degree, the authority which the nation has always exercised, of protecting, by means of its own direct legislation, rights created or secured by the Constitution. Any purpose to diminish the national authority in respect of privileges derived from the nation is distinctly negatived by the express grant of power, by legislation, to enforce every provision of the amendment, including that which, by the grant of citizenship in the State, secures exemption from race discrimination in respect of the civil rights of citizens.
It is said that any interpretation of the Fourteenth Amendment different from that adopted by the majority of the court, would imply that Congress had authority to enact a municipal code for all the States, covering every matter affecting the life, liberty, and property of the citizens of the several States. Not so. Prior to the adoption of that amendment the constitutions of the several States, without perhaps an exception, secured all persons against deprivation of life, liberty, or property, otherwise than by due process of law, and, in some form, recognized the right of all persons to the equal protection of the laws. Those rights, therefore, existed before that amendment was proposed or adopted, and were not created by it. If, by reason of that fact, it be assumed that protection in these rights of persons still rests primarily with the States, and that Congress may not interfere except to enforce, by means of corrective legislation, the prohibitions upon State laws or State proceedings inconsistent with those rights, it does not at all follow, that privileges which have been granted by the nation, may not be protected by primary legislation upon the part of Congress. The personal rights and immunities recognized in the prohibitive clauses of the amendment were, prior to its adoption, *56 under the protection, primarily, of the States, while rights, created by or derived from the United States, have always been, and, in the nature of things, should always be, primarily, under the protection of the general government. Exemption from race discrimination in respect of the civil rights which are fundamental in citizenship in a republican government, is, as we have seen, a new right, created by the nation, with express power in Congress, by legislation, to enforce the constitutional provision from which it is derived. If, in some sense, such race discrimination is, within the letter of the last clause of the first section, a denial of that equal protection of the laws which is secured against State denial to all persons, whether citizens or not, it cannot be possible that a mere prohibition upon such State denial, or a prohibition upon State laws abridging the privileges and immunities of citizens of the United States, takes from the nation the power which it has uniformly exercised of protecting, by direct primary legislation, those privileges and immunities which existed under the Constitution before the adoption of the Fourteenth Amendment, or have been created by that amendment in behalf of those thereby made citizens of their respective States.
This construction does not in any degree intrench upon the just rights of the States in the control of their domestic affairs. It simply recognizes the enlarged powers conferred by the recent amendments upon the general government. In the view which I take of those amendments, the States possess the same authority which they have always had to define and regulate the civil rights which their own people, in virtue of State citizenship, may enjoy within their respective limits; except that its exercise is now subject to the expressly granted power of Congress, by legislation, to enforce the provisions of such amendments  a power which necessarily carries with it authority, by national legislation, to protect and secure the privileges and immunities which are created by or are derived from those amendments. That exemption of citizens from discrimination based on race or color, in respect of civil rights, is one of those privileges or immunities, can no longer be deemed an open question in this court.
*57 It was said of the case of Dred Scott v. Sandford, that this court, there overruled the action of two generations, virtually inserted a new clause in the Constitution, changed its character, and made a new departure in the workings of the federal government. I may be permitted to say that if the recent amendments are so construed that Congress may not, in its own discretion, and independently of the action or non-action of the States, provide, by legislation of a direct character, for the security of rights created by the national Constitution; if it be adjudged that the obligation to protect the fundamental privileges and immunities granted by the Fourteenth Amendment to citizens residing in the several States, rests primarily, not on the nation, but on the States; if it be further adjudged that individuals and corporations, exercising public functions, or wielding power under public authority, may, without liability to direct primary legislation on the part of Congress, make the race of citizens the ground for denying them that equality of civil rights which the Constitution ordains as a principle of republican citizenship; then, not only the foundations upon which the national supremacy has always securely rested will be materially disturbed, but we shall enter upon an era of constitutional law, when the rights of freedom and American citizenship cannot receive from the nation that efficient protection which heretofore was unhesitatingly accorded to slavery and the rights of the master.
But if it were conceded that the power of Congress could not be brought into activity until the rights specified in the act of 1875 had been abridged or denied by some State law or State action, I maintain that the decision of the court is erroneous. There has been adverse State action within the Fourteenth Amendment as heretofore interpreted by this court. I allude to Ex parte Virginia, supra. It appears, in that case, that one Cole, judge of a county court, was charged with the duty, by the laws of Virginia, of selecting grand and petit jurors. The law of the State did not authorize or permit him, in making such selections, to discriminate against colored citizens because of their race. But he was indicted in the federal court, under the act of 1875, for making such discriminations. *58 The attorney-general of Virginia contended before us, that the State had done its duty, and had not authorized or directed that county judge to do what he was charged with having done; that the State had not denied to the colored race the equal protection of the laws; and that consequently the act of Cole must be deemed his individual act, in contravention of the will of the State. Plausible as this argument was, it failed to convince this court, and after saying that the Fourteenth Amendment had reference to the political body denominated a State, "by whatever instruments or in whatever modes that action may be taken," and that a State acts by its legislative, executive, and judicial authorities, and can act in no other way, we proceeded:
"The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position under a State government, deprives another of property, life, or liberty without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition; and, as he acts under the name and for the State, and is clothed with the State's power, his act is that of the State. This must be so, or the constitutional prohibition has no meaning. Then the State has clothed one of its agents with power to annul or evade it. But the constitutional amendment was ordained for a purpose. It was to secure equal rights to all persons, and, to insure to all persons the enjoyment of such rights, power was given to Congress to enforce its provisions by appropriate legislation. Such legislation must act upon persons, not upon the abstract thing denominated a State, but upon the persons who are the agents of the State, in the denial of the rights which were intended to be secured." Ex parte Virginia, 100 U.S. 346-7.
In every material sense applicable to the practical enforcement of the Fourteenth Amendment, railroad corporations, keepers of inns, and managers of places of public amusement are agents or instrumentalities of the State, because they are charged with *59 duties to the public, and are amenable, in respect of their duties and functions, to governmental regulation. It seems to me that, within the principle settled in Ex parte Virginia, a denial, by these instrumentalities of the State, to the citizen, because of his race, of that equality of civil rights secured to him by law, is a denial by the State, within the meaning of the Fourteenth Amendment. If it be not, then that race is left, in respect of the civil rights in question, practically at the mercy of corporations and individuals wielding power under the States.
But the court says that Congress did not, in the act of 1866, assume, under the authority given by the Thirteenth Amendment, to adjust what may be called the social rights of men and races in the community. I agree that government has nothing to do with social, as distinguished from technically legal, rights of individuals. No government ever has brought, or ever can bring, its people into social intercourse against their wishes. Whether one person will permit or maintain social relations with another is a matter with which government has no concern. I agree that if one citizen chooses not to hold social intercourse with another, he is not and cannot be made amenable to the law for his conduct in that regard; for even upon grounds of race, no legal right of a citizen is violated by the refusal of others to maintain merely social relations with him. What I affirm is that no State, nor the officers of any State, nor any corporation or individual wielding power under State authority for the public benefit or the public convenience, can, consistently either with the freedom established by the fundamental law, or with that equality of civil rights which now belongs to every citizen, discriminate against freemen or citizens, in those rights, because of their race, or because they once labored under the disabilities of slavery imposed upon them as a race. The rights which Congress, by the act of 1875, endeavored to secure and protect are legal, not social rights. The right, for instance, of a colored citizen to use the accommodations of a public highway, upon the same terms as are permitted to white citizens, is no more a social right than his right, under the law, to use the public streets of a city or a town, or a turnpike road, or a public market, or a post office, or his right to sit *60 in a public building with others, of whatever race, for the purpose of hearing the political questions of the day discussed. Scarcely a day passes without our seeing in this court-room citizens of the white and black races sitting side by side, watching the progress of our business. It would never occur to any one that the presence of a colored citizen in a court-house, or court-room, was an invasion of the social rights of white persons who may frequent such places. And yet, such a suggestion would be quite as sound in law  I say it with all respect  as is the suggestion that the claim of a colored citizen to use, upon the same terms as is permitted to white citizens, the accommodations of public highways, or public inns, or places of public amusement, established under the license of the law, is an invasion of the social rights of the white race.
The court, in its opinion, reserves the question whether Congress, in the exercise of its power to regulate commerce amongst the several States, might or might not pass a law regulating rights in public conveyances passing from one State to another. I beg to suggest that that precise question was substantially presented here in the only one of these cases relating to railroads  Robinson and Wife v. Memphis & Charleston Railroad Company. In that case it appears that Mrs. Robinson, a citizen of Mississippi, purchased a railroad ticket entitling her to be carried from Grand Junction, Tennessee, to Lynchburg, Virginia. Might not the act of 1875 be maintained in that case, as applicable at least to commerce between the States, notwithstanding it does not, upon its face, profess to have been passed in pursuance of the power of Congress to regulate commerce? Has it ever been held that the judiciary should overturn a statute, because the legislative department did not accurately recite therein the particular provision of the Constitution authorizing its enactment? We have often enforced municipal bonds in aid of railroad subscriptions, where they failed to recite the statute authorizing their issue, but recited one which did not sustain their validity. The inquiry in such cases has been, was there, in any statute, authority for the execution of the bonds? Upon this branch of the case, it may be remarked that the State of Louisiana, in 1869, passed a statute *61 giving to passengers, without regard to race or color, equality of right in the accommodations of railroad and street cars, steamboats or other water crafts, stage coaches, omnibuses, or other vehicles. But in Hall v. De Cuir, 95 U.S. 487, that act was pronounced unconstitutional so far as it related to commerce between the States, this court saying that "if the public good requires such legislation it must come from Congress, and not from the States." I suggest, that it may become a pertinent inquiry whether Congress may, in the exertion of its power to regulate commerce among the States, enforce among passengers on public conveyances, equality of right, without regard to race, color or previous condition of servitude, if it be true  which I do not admit  that such legislation would be an interference by government with the social rights of the people.
My brethren say, that when a man has emerged from slavery, and by the aid of beneficent legislation has shaken off the inseparable concomitants of that state, there must be some stage in the progress of his elevation when he takes the rank of a mere citizen, and ceases to be the special favorite of the laws, and when his rights as a citizen, or a man, are to be protected in the ordinary modes by which other men's rights are protected. It is, I submit, scarcely just to say that the colored race has been the special favorite of the laws. The statute of 1875, now adjudged to be unconstitutional, is for the benefit of citizens of every race and color. What the nation, through Congress, has sought to accomplish in reference to that race, is  what had already been done in every State of the Union for the white race  to secure and protect rights belonging to them as freemen and citizens; nothing more. It was not deemed enough "to help the feeble up, but to support him after." The one underlying purpose of congressional legislation has been to enable the black race to take the rank of mere citizens. The difficulty has been to compel a recognition of the legal right of the black race to take the rank of citizens, and to secure the enjoyment of privileges belonging, under the law, to them as a component part of the people for whose welfare and happiness government is ordained. *62 At every step, in this direction, the nation has been confronted with class tyranny, which a contemporary English historian says is, of all tyrannies, the most intolerable, "for it is ubiquitous in its operation, and weighs, perhaps, most heavily on those whose obscurity or distance would withdraw them from the notice of a single despot." To-day, it is the colored race which is denied, by corporations and individuals wielding public authority, rights fundamental in their freedom and citizenship. At some future time, it may be that some other race will fall under the ban of race discrimination. If the constitutional amendments be enforced, according to the intent with which, as I conceive, they were adopted, there cannot be, in this republic, any class of human beings in practical subjection to another class, with power in the latter to dole out to the former just such privileges as they may choose to grant. The supreme law of the land has decreed that no authority shall be exercised in this country upon the basis of discrimination, in respect of civil rights, against freemen and citizens because of their race, color, or previous condition of servitude. To that decree  for the due enforcement of which, by appropriate legislation, Congress has been invested with express power  every one must bow, whatever may have been, or whatever now are, his individual views as to the wisdom or policy, either of the recent changes in the fundamental law, or of the legislation which has been enacted to give them effect.
For the reasons stated I feel constrained to withhold my assent to the opinion of the court.