FROST, Appellant, v. MICHENOR et al., Respondents. (Supreme Court, Appellate Division, Third Department. July 6, 1898.) Action by Charles S. Frost against Amos J. Michenor and Elizabeth J. McClintock.

PER CURIAM. Judgment affirmed, with costs. All concur, except LANDON, J., dissenting.

LANDON, J. (dissenting). This is an appeal from a judgment dismissing the plaintiff's complaint upon the merits, with costs, entered in Schuyler county in April, 1896, upon the decision of the court upon the trial without a jury. The plaintiff is the owner and manager of a large summer hotel in the village of Watkins. The defendants are the lessees and managers of two hotels in the same village, and also of "Watkins Glen," a tract of about 500 acres of land, which contains, as the trial court has found, "a number of glens rising one above another, forming a series of rocky arcades, affording many different views of rocks, water falls, cliffs, gorges, and other interesting and grand natural sights, * * * fitted up with stairs and ·railings and paths, to enable the visitors therein to pass through and enjoy the same." The regular admission thereto, as charged by the defendants, has been 50 cents; but the defendants have lessened this charge to suit themselves, but have never increased it, except as to the guests of the plaintiff's hotel, to whom they were charging $1 for admission to the glen at the time this action was ·brought, and threatened to continue such charge. The hotels of the respective parties are near the entrance to the glen, and each one is largely supported by and dependent upon the patronage of visitors to the glen, the number of whom is very large every summer. The plaintiff's hotel is worth $25,000 if its guests can be admitted to the glen at the price of 50 cents each, usually charged by the defendants to the general public; but, if the charge of $1 is maintained against them, that value is much diminished, and plaintiff would, in·consequence, suffer irreparable injury in his said business and property. By this action he sought to enjoin the defendants from discriminating in the price of admission to the glen against the guests of his hotel; and from the judgment against him he appeals. My brethren think the judgment should be affirmed, upon the authority of Grannan v. Association, 153 N. Y. 449, 47 N. E. 896. I doubt whether that case is decisive of this; and as I think the plaintiff ought to recover, and the question involved is an interesting. one, it may not be unprofitable to indicate the grounds of my opinion.

The main reliance of the plaintiff is upon chapter 1042, Laws 1895, which is as follows:

"An Act to Protect All Citizens in Their Civil and Legal Rights.

"Section 1. That all persons within the jurisdiction of this state shall be entitled to the full and equal accommodations, advantages, facilities and privileges of inns, restaurants, hotels, eating-houses, bath-houses, barber-shops, thea-

ters, music halls, public conveyances on land and water, and all other places of public accommodation or amusement, subject only to the conditions and limitations established by law, and applicable alike to all citizens.

"Sec. 2. That any person who shall violate any of the provisions of the foregoing section by denying to any citizens, except for reasons applicable alike to all citizens of every race, creed or color, * * * the full enjoyment of any of the accommodations, advantages, facilities or privileges in said section enumerated, or by aiding or inciting such denial, shall for every offense forfeit and pay a sum not less than one hundred dollars nor more than five hundred dollars to the person aggrieved thereby, to be recovered in any court of competent jurisdiction, in the county where said offense was committed; and shall, also, for every such offense be deemed guilty of a misdeameanor, and, upon conviction thereof shall be fined not less than one hundred dollars nor more than five hundred dollars, or shall be imprisoned not less than thirty days nor more than ninety days, or both such fine and imprisonment."

That the glen in question is a place of ·public amusement is established by the evidence. It is so, because of its natural attractions, enhanced and made more enjoyable by the conveniences and refinements of art. It is private property, but property which cannot be duplicated by any competitor. Of course, the public have an interest in the attractions which nature has thus lavished for their admiration and amusement; and the defendants, seeking profit out of such interest, have devoted the glen to the public use, upon payment of their price of admission; and therefore, within the doctrine of Munn v. Illinois, 94 U. S. 113, the owners must submit to be controlled by the public for the common good so long as they maintain such use. People v. Budd, 117 N. Y. 1, 22 N. E. 670, 682, affirmed 143 U. S. 517, 12 Sup. Ct. 468; People v. King, 110 N. Y. 418, 18 N. E. 245; People v. Boston & A. R. Co., 70 N. Y. 569; Dow v. Beidelman, 125 U. S. 680, 8 Sup. Ct. 1028; Brass v. North Dakota, 153 U. S. 391, 14 Sup. Ct. 391, 14 Sup. Ct. 857; Covington & C. Bridge Co. v. Kentucky, 154 U. S. 204, 14 Sup. Ct. 1087; Louisville & N. R. Co. v. Kentucky, 161 U. S. 677, 16 Sup. Ct. 714. The public, by the statute cited, simply assume control to the extent of commanding "that all persons within the jurisdiction of this state shall be entitled to the full and equal accommodations, advantages, facilities, and privileges" thereof, "subject only to the conditions and limitations established by law and applicable alike to all citizens." What are the conditions and limitations established by law? Clearly, the common-law right of the defendants to fix a reasonable price of admission, and the payment by every visitor of such price, and the observance of the reasonable regulations, as the defendants apply them equally to all visitors. This does not mean that the owners may not admit their own guests for nothing, and picnic and pleasure parties at reduced rates; but it does mean that the owners cannot fix higher rates for the plaintiff's guests than for other members of the general public. In other words, the defendants must not boycott the guests of the plaintiff's hotel, and extort

money from them, with the purpose, and none other, of thus ruining the plaintiff or preventing his competition in the hotel business. Apart from a remark by the court in Grannan v. Association, 153 N. Y. 449, 47 N. E. 896, likening the statute above quoted to the first and second sections of the act of congress known as the "Civil Rights Act" (18 Stat. 335), and incidentally stating, upon the supposed authority of the Civil Rights Cases, 109 U. S. 3, 3 Sup. Ct. 18, that "the purpose of the statute now under consideration was to declare that no person should be deprived of any of the advantages enumerated upon the ground of race, creed, or color; and that its prohibition was intended to apply to cases of that character, and to none other," the case is unlike this. My brethren rest their decision upon this obiter dictum. I do not think it is binding upon us. In that case it appeared that the Westchester Racing Association was a corporation organized for the purpose, among other things, of promoting honest horse racing. To that end, rules authorizing the exclusion of persons guilty of practices tending to promote dishonest racing were authorized and made. Under them the plaintiff was duly found guilty of a corrupt practice, and therefore was excluded, and the court held that he was properly excluded. The court was not so obtuse as not to see that such rules were reasonable and necessary if honest horse racing was to be really accomplished. The plaintiff cited chapter 1042, Laws 1895. That act, however, does not profess to continue privileges to persons who abuse them to the destruction of their purposes; and such is the doctrine of the case cited, and the real ground of the decision. The civil rights act of congress was considered in the Civil Rights Cases, 109 U. S. 3, 3 Sup. Ct. 18; and the first and second sections thereof were held to be unconstitutional, for the reason that they were infringements upon the domain of the reserved powers of the states, unless they were authorized by the thirteenth and fourteenth amendments to the federal constitution; and the court held that they were not thereby authorized. The supreme court of the United States examined the thirteenth amendment, and held that the first and second sections of the civil rights act had no support therein, for the reason that that amendment had sole reference to "slavery" and "involuntary servitude," as those terms were understood in this country, meaning African slavery as it formerly existed. The argument in support of the law was "that the denial (to any person) of such equal accommodations and privileges is in itself a subjection to a species of servitude, within the meaning of the amendment." But the court held that such denial does not subject that person "to any form of servitude, or tend to fasten upon him any badge of slavery," and that the two sections of the act could not be upheld under the thirteenth amendment, because not proper or necessary "for the obliteration and prevention of slavery" or "its badges and incidents." Nor could the sections be sustained under the fourteenth amendment, because the prohibitions thereof, namely, "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, lib-

erty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws," were directed to state action, and not to that of individuals. The court held it was not individual invasion of individual rights, but state invasion thereof, that the fourteenth amendment prohibited. Congress was given power to enforce the prohibition against the state; nothing more. Congress was not given any power to legislate upon any subject within the domain of state legislation. The court said the act "steps into the domain of local jurisprudence, and lays down rules for the conduct of individuals in society towards each other. * * * It is repugnant to the tenth amendment of the constitution, which declares that powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people. * * * Civil rights such as are guarantied by the constitution against state aggression cannot be impaired by the wrongful acts of individuals, unsupported by state authority in the shape of laws, customs, or judicial or executive proceedings."

Thus, as it seems to me, we are instructed by the supreme court of the United States that the civil rights enumerated either in the act of congress or the statute of this state cannot be conferred by the United States upon individuals, but may be conferred by the states. In the light of this instruction, chapter 1042, Laws 1895, was enacted. That the rights therein enumerated also exist at common law, the Civil Rights Cases assume for the sake of the argument, and the case of Munn v. Illinois, supra, seems to support the assumption. But, however that may be, they now exist to the extent that our statute confers them. The idea that our statute must be restricted in its scope to the badges and incidents of African slavery has, I respectfully submit, no support in the Civil Rights Cases. The act of congress was passed in 1875; the statute of the state in 1895,—20 years later. Congress had legislative power over the question of slavery, its badges and incidents, and not over the general subject of the civil rights of the individual. In 1875 the complete enfranchisement of the former slaves, and all discrimination in civil rights against them or against the African race, was still a pressing matter of national concern. Every reasonable intendment, therefore, had to be indulged that the act of congress was within its jurisdiction; and therefore, if it could be construed as limited to the subject of slavery and its incidents, it was the duty of the court so to limit it. The court, for the purposes of construction, so limited it, and yet found that the denial to a person of color of equal privileges, in an inn or railroad car, with a white man, was not imposing any servitude or badge of slavery upon him, and therefore, so construed, the act was unauthorized. The court also held that the act, construed as having a wider scope, and intended to confer civil rights generally upon individuals, trenched upon the domain of the jurisdiction reserved to the states, and therefore was also unauthorized. It cannot be assumed that so late as 1895, after congress had practically settled the vexed questions arising from the abolition of slavery, the legislature of the state of New York

had any intention of meddling with them. Every intendment must be indulged that the legislature meant to keep within its proper jurisdiction; and if the act of 1895 is equally susceptible of two constructions, one of intermeddling with national affairs, and the other of attending to state affairs, the latter construction must be adopted. Moreover, since 1875 some advance has been made in the perception of the extent to which a government may regulate the conduct of its citizens towards each other, and, when necessary for the public good, the manner in which each person shall use his own property, especially such property as he has devoted to the use of the public. It suffices to refer to Munn v. Illinois, supra, decided in 1876, and the cases since decided upon its authority. The legislature was advised by the Civil Rights Cases of the narrow scope of the national legislative power, and of the broad scope of its own, in respect of the general subject of the civil rights of the individual. It must, I think, be presumed to have intended to enter its own field, and keep aloof from the national field. It could give to its language the full force of plenary power, unhedged by any such narrow limits as hampered congress. It will be seen that both acts purport to confer upon all persons the equal right to the accommodation and privileges of places of public amusement, "subject only to the conditions and limitations established by law, and applicable alike to all citizens," and here the condition ends in the state statute; but it is significant that in the act of congress the last condition reads, "and applicable alike to citizens of every race and color, regardless of any previous condition of servitude." These words used by congress, and omitted by the legislature, indicate, not obscurely, that the legislature wished to avoid any suggestion that its bestowment of rights was restricted to the class of persons which the final clause of the federal section would, if used, present to the mind. The legislature had already, by section 383, Pen. Code (People v. King, supra), precluded the denial to any person, on account of his race or color, of equality of privileges and accommodations in places of public amusement. The act of 1895 may rather be regarded as a legislative attempt, among other things, to check in some particulars the tendency of white men to wield their property rights to crush out the competing efforts and interests of others. The private dominion of private property rests upon the consent and support of the state, and the state may, in the exercise of its police power, except as restrained by constitutional limitations, annex such conditions thereto as may promote the general welfare.