### WEST v. BLILEY et al.

District Court, E. D. Virginia.    June 5, 1929.

No. 795.

Alfred E. Cohen and J. R. Pollard, both of Richmond, Va., for plaintiff.

Leon M. Bazile, Wilmer L. O'Flaherty, and M. J. Fulton, all of Richmond, Va., for defendants.

GRONER, District Judge. The declaration alleges that the plaintiff is a citizen of the United States and resides in the first precinct of Madison ward in the city of Richmond, Va.; that the first two above named defendants were the duly appointed judges, and the last named the duly appointed clerk, at a primary election held in the city of Richmond on the 3d of April, 1928, for the purpose of nominating candidates on the Democratic ticket for mayor, councilman, and alderman; that the plaintiff, who is a negro, was on that day a male citizen of the United States over 21 years of age, in all respects qualified to vote in the ensuing general election; and that he was and had been

for some time past a bona fide member of the Democratic party of the state of Virginia.

The action is brought to recover damages for the refusal by the defendants to permit the plaintiff to vote in the above-mentioned primary solely because he was a negro. Defendants have filed a demurrer to the declaration. This raises the question whether the action of the defendants in excluding the plaintiff from voting was an infringement of the rights guaranteed to him by the Fourteenth and Fifteenth Amendments of the Federal Constitution. The action is brought under section 43 of title 8 of U. S. C. A.

Section 36 of the Constitution of Virginia provides as follows:

"The General Assembly shall enact such laws as are necessary and proper for the purpose of securing the regularity and purity of general, local and primary elections, and preventing and punishing any corrupt practices in connection therewith; and shall have power, in addition to other penalties and punishments now or hereafter prescribed by law for such offences, to provide that persons convicted of them shall thereafter be disqualified from voting or holding office."

Pursuant to this authority, the General Assembly of Virginia has provided (Code 1924, c. 15, § 221) a comprehensive plan in relation to primary elections, providing therein for participation by any political party which shall at the preceding presidential election have polled at least one-fourth of the total vote cast in such election. The provisions of this chapter apply to the nominations of all candidates for office to be nominated by a direct primary. The right is granted to the party authorities of any political party qualified to participate in such a primary to adopt some other method for the nomination of candidates for office, but, when participation in the direct primary is decided on by such party authorities, the time when the same is to be held, the conduct of same, the appointments of judges and clerks, the method of holding the election and returning the ballots, the appointment of commissioners to canvass the vote, the duty of the state board of canvassers in relation to declaring the result, the provision for securing order at the polls, the prevention of frauds in the election, are all provided for in like manner as in the general election, including provision for the payment of the expenses of holding and conducting the primary, payment of judges and clerks of election, furnishing necessary stationery and supplies, rent of polling places, furnishing and distributing ballot boxes and poll books, etc., in the same way and to the same extent as in a general election.

Section 228 provides who may vote, and includes "all persons qualified to vote at the election for which the primary is held, *and not disqualified by reasons of other requirements in the law of the party to which he belongs.*" (Italics added.) It further provides that no person shall vote except for the candidates of the party to which he belongs and which he supported in the preceding election.

The declaration alleges, and the demurrer admits that the plaintiff was excluded from voting in the direct primary because of a resolution adopted by the State Democratic Convention in 1924, pursuant to the authority of the statute, declaring that only white persons should participate in a Democratic primary.

Counsel for defendants admit, as of course they must, that a statute of a state which attempted to exclude negroes from voting in a Democratic primary would be in conflict with the Fourteenth Amendment of the Federal Constitution (Nixon v. Herndon, 273 U. S. 536, 47 S. Ct. 446, 71 L. Ed. 759), but insist that the discrimination against the plaintiff complained of here was the act of an individual or a group of individuals acting as such, and therefore not within the purview of the Federal Constitution.

The history and circumstances of the adoption of the Fourteenth and Fifteenth Amendments to the Constitution have no place in this discussion. For the present it is sufficient to point out that the Fourteenth Amendment determines that persons born therein or naturalized according to law are citizens of the United States and of the state where they reside; that no state shall abridge the privileges and immunities of any citizen or deny him equal protection of the laws. To the states it says that no law shall be made or enforced to diminish any one of the privileges and immunities of the people of the United States, and it directs Congress to adopt such laws as may be necessary to enforce the amendment. As construed by the Supreme Court (Civil Rights Cases, 109 U. S. 3, 3 S. Ct. 18, 27 L. Ed. 835; James v. Bowman, 190 U. S. 127, 23 S. Ct. 678, 47 L. Ed. 979), the first section of the amendment is a prohibitory measure and its prohibitions operate against states and not against private persons. The point, therefore, on which this case turns, is whether the act of the election officers—the defendants—was an offi-

cial act or a personal act, that is to say, was in the performance of a duty enjoined on them by statute or was merely individual and personal, and authorized by a right inherent in the political organization to which they belonged. Defendants say that the latter is the correct view; that affiliation with a political party is not, a matter of right but of party regulation; and that the Legislature, as such, has no authority to fix standards or qualifications of membership. Grigsby v. Harris (D. C.) 27 F.(2d) 942. They say, in effect, that there is no legal ban on the formation of a political party based wholly on color or on religious belief or on sex or on any other standard which the party chooses to adopt, and that, because of this, the General Assembly of Virginia in recognizing the right made no delegation of power, but only recognized the existence of the power where it had always resided.

There can be no doubt, at least so far as the state of Virginia is concerned, that a political party may refuse to avail itself of the privileges of the direct primary and may nominate candidates to be voted for in a general or special election in any of the ways in which such nominations were made before the introduction of the primary. Candidates for public office may be made such by petition, by action of a caucus, or by a convention. Indeed, they may be nominated in a primary conducted by the party under its own rules and at its own expense. But a much more delicate question arises when the legalized primary is adopted by a party in order to secure the greater safeguard and freedom of expense thereby provided. May a political party adopt the statutory method of naming its candidates for political office, and still preserve the absolute right to determine who shall participate in the election? The primary as a means of naming candidates for a place on the official ballot is comparatively modern. Its spread in the last quarter of a century has been steady, and it is to-day in practically every state the exclusive method adopted by the two great political parties for the nomination of candidates for office, state and federal. Its growth and adoption as a vital part of the election system arose because of the importance to the public to "give vitality to the constitutional guaranty of a free and untrammeled ballot." This purpose may not be better stated than in repeating the language of Judge Keith in Commonwealth v. Willcox, 111 Va. p. 859, 69 S. E. 1031, as follows:

"We know, as a matter of common knowl-edge, that the purpose of holding a primary election is to select a candidate to be voted for by a party organization at the ensuing general or special election. We know that the person selected at the primary election to be voted for at the general or special election will receive the votes of the members of the party to which he belongs and for which the primary is held, and if both political organizations, or all political organizations, into which a community is divided, hold primary elections, it necessarily follows that the person chosen at the primary becomes the nominee of his party to be voted for at the general election, and that one of the primary nominees will ultimately be elected to the office.

"In other words, the primary when adopted by a political party becomes an insepara-ble part of the election machinery, and if a candidate to be voted for at the general election is to be selected at a primary, it is impossible to secure the regularity and puri-ty of the general election without in the first place guarding against irregularity and fraud at the primary election. The primary election constitutes a necessary part, and fulfils an essential function in the plan to promote honesty in the conduct of elections —elections which shall faithfully reflect and register the unbought will of the electors.

"If there be fraud in the primary elec-tion, which is the very root from which the whole system of regulation springs, it is vain to regulate the conduct of general elections, for the fraud by which the nominee at the primary election is chosen enters into and is an ineradicable constituent in the result. However fair the general election may be, if at that election men have no choice but to vote for candidates who have been nominated by fraudulent practices at primaries, or else to desert their party, which would be in most instances but to throw away their votes without achieving any good result, the effect of the election must be the consummation of a fraud and the defeat of the will of the people, for 'of thorns men do not gather figs, nor of a bramble bush gather they grapes.'

"We are of opinion that section 122–o is not only cognate and germane to, congruous with and in furtherance of the object ex-pressed in the title to chapter 10 of the Code, which fully satisfies the requirements of the Constitution, without resort to any liberality of construction, but that primary elections in their nature have such a relation to and bear-ing upon general elections, that the omis-sion to bring them within the law would have left the plan devised by the Legislature for

securing the regularity and purity of elections wholly abortive and ineffectual."

In Nixon v. Herndon, supra, the Supreme Court said that "the same reasons that allow a recovery for denying the plaintiff a vote at a final election allow it for denying a vote at the primary election that may determine the final result," and, in construing a statute of Texas providing that "in no event shall a negro be eligible to participate in a Democratic party primary election held in the State of Texas," etc., declared the statute an infringement of the Fourteenth Amendment.

The Statute of Virginia, unlike that of Texas, does not in terms exclude the negro, but gives to the party participating the right to do so. The result is the same. The Legislature, pursuant to constitutional authority, having undertaken to regulate primary elections and to authorize them to be held at the public expense and to provide the same rules and regulations applicable to an election, may not indirectly, any more than it may directly, exclude a duly qualified voter who declares himself to be an adherent to the party participating in the primary from the exercise of his right of suffrage. The Fourteenth Amendment compels the adoption of what is called impartial suffrage. Its purpose was to establish all over the United States one people, and that each of these may understand the constitutional fact that his privileges and immunities cannot be abridged by state authority, and that these rights are not confined to any class or race, but comprehend all within its scope. The General Assembly of Virginia having provided the primary as a method (though optional) for the nomination of candidates, and the Supreme Court of Virginia having declared it when adopted an inseparable part of the election machinery, it would seem to me necessarily to follow that the Legislature cannot by delegation or otherwise give vitality to a claimed right which it is itself prohibited by the Constitution from enacting into law.

In People ex rel. Breckon v. Board of Election Commissioners, 221 Ill. 9, 77 N. E. 321, 5 Ann. Cas. 562, it was held that a primary election law which provides that the county committees of a political party shall determine whether candidates shall be nominated by a majority or a plurality vote is invalid as a delegation of legislative power,

the basis of this decision being that, since the Legislature had enacted a statute regulating the form of the ballot, what shall appear upon it, and how the candidates whose names appear shall be chosen, it had drawn to itself the duty of determining the question whether a majority or plurality vote should be necessary to nominate, and that the delegation of this right to a political party might not be legally done, and this is no more than the recognition of the well-established maxim that a law must be complete in all its terms and conditions when it leaves the Legislature. Cooley's Const. Lim. (7th Ed.) 163. In the statute under consideration, there is not only a delegation of legislative power—in itself unconstitutional—but also in its purpose and effect a recognition of a further power which the Legislature itself does not possess. Admittedly the state may not provide otherwise than for equal rights of suffrage as well in the primary as in the election. This the statute does, and, if this were all, there would be no ground of complaint, but it goes farther, and recognizes and enforces the right of a political party to prescribe qualifications forbidden under the Fifteenth Amendment of the Constitution of the United States. This a state may not do. "The legitimate purpose of such a law, * * * must be to sustain and enforce the provisions of the Constitution and the rights of voters, and not to curtail or subvert them or injuriously restrict such rights." People v. Commissioners, supra. That a law which recognizes or which authorizes a discriminatory test or standard does curtail and subvert them there can be no doubt, and such a law is therefore in conflict with the Fourteenth and Fifteenth Amendments to the Constitution of the United States.

Impressed with the importance of the question raised in this case, and mindful likewise of the responsibility of its decision, I have given the case careful thought. That its effect may be to change a custom that has long obtained in the political system in effect in this state, and therefore meet with the disapproval of many, is a consequence which, unpleasant though it may be, may nevertheless not be avoided in the performance of the duty devolving on the court.

The demurrer will be overruled, and the defendants given 60 days in which to plead further, and the case will stand continued.