BOARD OF TRUSTEES OF SOUTHERN ILLINOIS UNIVERSITY *et al.*, Plaintiffs-Appellees, v. THE DEPARTMENT OF HUMAN RIGHTS *et al.*, Defendants-Appellants.

Fifth District  No. 5—90—0796

Opinion filed May 7, 1992.

WELCH, J., dissenting.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Susan Frederick Rhodes, Assistant Attorney General, of Chicago, of counsel), for appellants.

Shari R. Rhode and Denise E. Gale, both of Board of Trustees of Southern Illinois University at Carbondale, of Carbondale, Theodore R. LeBlang and M. Douglass Henderson, both of Southern Illinois University, School of Medicine, of Springfield, and John Gilbert, of Southern Illinois University at Edwardsville, of Edwardsville, for appellees.

Kenneth G. Kombrink, of Board of Trustees of University of Illinois, Richard T. Dunn, of Illinois Board of Governors of State Colleges and Universities, and Carol J. Fines, of Illinois Board of Regents of Regency Universities, all of Chicago, for *amicus curiae*.

JUSTICE HARRISON delivered the opinion of the court:
Defendants, the Illinois Department of Human Rights (the Department); the Department's director, Joyce E. Tucker; and two of its investigators, Freddie Gatewood and Stanley R. Moen, appeal from a judgment of the circuit court of Jackson County which granted a writ of prohibition to prevent them from pursuing charges that plaintiffs, the Board of Trustees of Southern Illinois University (SIU) and certain of the university's employees, David White, Jim Bramlet, Richard Moy, and Terry Travis, were guilty of unlawful discrimination in violation of the Illinois Human Rights Act (Ill. Rev. Stat. 1989, ch. 68, par. 1—101 *et seq.*). The circuit court's judgment was based solely on the proposition that the Department did not have statutory jurisdiction to investigate the charges because the alleged discrimination occurred in the context of the university's academic programs. We reverse.
The dispute which gave rise to this appeal began when two SIU students, Kevin Mitchell and Marsha Stokes, filed charges with the Department alleging that plaintiffs had discriminated against them based on race or sex in violation of the Illinois Human Rights Act (Ill. Rev. Stat. 1989, ch. 68, par. 1—101 *et seq.*). Both Mitchell and Stokes

are of African-American descent. Mitchell charged that Terry Travis, the "Director of Psychiatry Clerkship" at SIU's school of medicine, and Richard Moy, the medical school's dean, had unlawfully discriminated against him based on his race and sex when he was dismissed from the medical school after his third year there. According to Mitchell, he was treated differently than his nonblack and female classmates in the way he was evaluated, and he was denied the same opportunities to retake final examinations and clerkships that were afforded to his nonblack and female classmates. Mitchell further charged that Travis had demonstrated a racial bias against black male students and that this bias harmed the evaluation of Mitchell's psychiatry clerkship at the hearing on his dismissal from the school.

Stokes, for her part, alleged that she had been the only black student in the commercial graphics program at SIU's school of technical careers. She claimed that David White; Jim Bramlet, an instructor of commercial graphics; and SIU's Board of Trustees were guilty of unlawful discrimination based on race in that they had sanctioned the existence of a racially hostile classroom environment in which the other students, who were white, were allowed to harass and threaten her and to subject her to racial epithets such as "nigger." She also asserted that when she was suspended from class she did not receive the advance notice that the university usually provided to others.

The Department served copies of these charges on SIU's Board of Trustees and on the particular faculty members involved. It also notified them of their statutory obligation to file a verified response to the allegations contained therein. (See Ill. Rev. Stat. 1989, ch. 68, par. 7A—102.) SIU responded, through counsel, on behalf of all of the parties against whom the charges were filed. In that response it advised the Department of its view that the Department lacked jurisdiction "to entertain allegations of racial discrimination in academic programs."

When the Department informed SIU that it still intended to assert jurisdiction over the charges, the SIU Board of Trustees and the faculty members involved filed a petition in the circuit court of Jackson County to obtain a writ of prohibition to block the Department from proceeding further. The circuit court subsequently entered a default judgment permanently enjoining the Department, its agents and employees from taking any additional action with regard to the charges filed by Mitchell and Stokes. That default judgment, which was entered on procedural grounds, was reversed by this court in *Board of Trustees of Southern Illinois University v. Department of*

*Human Rights* (1989), 190 Ill. App. 3d 644, 546 N.E.2d 1039, and we remanded the cause for a decision on the merits.

On remand, SIU's Board of Trustees, White, Bramlett, Moy, and Travis filed an amended petition for a writ of prohibition. It was essentially the same as the original, but added a request to block the Department and its investigators from "conducting any and all proceedings" in the matter of an unlawful discrimination claim filed by an additional student, Michael Scruggs. Like the other students, Scruggs was of African-American descent. His charge was that the Board of Trustees had unlawfully discriminated against him in that he was graded and tested differently than white students, as a result of which he was denied admission to a Ph.D. program.

The amended petition was decided on cross-motions for summary judgment. There were no disputed facts. The only question was one of law, namely, whether the Department had statutory jurisdiction to pursue the discrimination charges filed by Mitchell, Stokes, and Scruggs where, as here, the challenged conduct occurred in the context of the university's academic programs. As indicated at the outset of this opinion, the circuit court held that the Department had no such jurisdiction. It therefore granted the writ of prohibition. From this judgment the Department, Tucker, Gatewood, and Moen now appeal.

■ Prohibition is an extraordinary writ. (*Orenic v. Illinois State Labor Relations Board* (1989), 127 Ill. 2d 453, 467, 537 N.E.2d 784, 791.) It will be granted only if four conditions are met: (1) the action to be prohibited must be judicial or quasi-judicial in nature; (2) the jurisdiction of the tribunal against which the writ is sought must be inferior to that of the issuing court; (3) the action to be prohibited must either be outside the tribunal's jurisdiction or, if within its jurisdiction, beyond its legitimate authority; and (4) the petitioner must be without any other adequate remedy. 127 Ill. 2d at 468, 537 N.E.2d at 791.

■ What the Board of Trustees and the named faculty members seek to prohibit in this case is not action by some inferior judicial tribunal, but rather the conduct of an administrative agency and its employees. The law is well established, however, that the actions of administrative officials may be sufficiently judicial in nature to be subject to a writ of prohibition. (127 Ill. 2d at 468, 537 N.E.2d at 791.) Although the parties have not explicitly so stated, they appear to agree that in advising the Board of Trustees and the faculty members that it intended to assert jurisdiction and to proceed against them on the students' discrimination claims, the Department here was

engaged in this type of judicial action. The first element for the writ has therefore been satisfied.

Elements two and four have also been met. There is no dispute that the Department constitutes a tribunal which is inferior to the court from which the writ was sought. In addition, no claim has been made that alternative remedies are available to the faculty members and Board of Trustees through administrative review or otherwise. Accordingly, the resolution of this appeal turns solely on element number three: whether the Department and its employees would exceed their legitimate authority, if not their very jurisdiction, by pursuing the discrimination charges against the Board of Trustees and the specified faculty members. We hold that they would not.

■ Strictly speaking, the concept of jurisdiction is inapplicable to administrative agencies. The term has, however, been used to designate an agency's power to act. (*Robinson v. Human Rights Comm'n* (1990), 201 Ill. App. 3d 722, 726, 559 N.E.2d 229, 230.) It is axiomatic that an agency's power to act is defined by the legislation under which the agency was created. (201 Ill. App. 3d at 726-27, 559 N.E.2d at 232.) The agency here is the Department, which was established by the Illinois Human Rights Act. (See Ill. Rev. Stat. 1989, ch. 68, pars. 7—101 through 7—111.) That Act specifically authorizes the Department to issue, receive, investigate, conciliate, settle, and dismiss charges that a civil rights violation has been committed. Ill. Rev. Stat. 1989, ch. 68, pars. 7—101, 7A—102, 7A—103.

■ Under section 5—102(C) of the Act (Ill. Rev. Stat. 1989, ch. 68, par. 5—102(C)), a civil rights violation occurs when a "public official" denies or refuses to another "the full and equal enjoyment of the accommodations, advantage, facilities or privileges of the official's office or services or of any property under the official's care because of unlawful discrimination." In this case, there is no question that SIU's Board of Trustees and the named faculty members constitute such "public officials," for the Act defines that term broadly to include "any officer or employee of the state or any agency thereof, including *** educational institutions and schools." (Ill. Rev. Stat. 1989, ch. 68, par. 5—101(C).) There is also no dispute that what these officials are accused of is "unlawful discrimination," for "unlawful discrimination" is expressly defined by the Act to include, among other things, discrimination against a person because of his or her race, color, or sex. Ill. Rev. Stat. 1989, ch. 68, par. 1—103(Q).

The Board of Trustees and the named faculty members argue that the Department is nevertheless powerless to act because the

unlawful discrimination cited by the students cannot be said to involve the denial or refusal of the full and equal enjoyment of any "accommodations" under their care. They base their argument on the proposition that the term "accommodations" as used in section 5—102(C) (Ill. Rev. Stat. 1989, ch. 68, par. 5—102(C)) is synonymous with the phrase "place of public accommodation." Under the Act, a "place of public accommodation" is defined to include a broad spectrum of business, refreshment, entertainment, recreation, and transportation facilities whose goods and services are made "available to the public." (Ill. Rev. Stat. 1989, ch. 68, par. 5—101(A)(1).) By way of example, the Act includes in this definition such diverse places as restaurants, bathrooms, theaters, elevators, clothing stores, and concerts. Ill. Rev. Stat. 1989, ch. 68, par. 5—101(A)(2).

■ Plaintiffs do not contest that certain facets of the university fall within this expansive definition. They argue, however, that just because the university might be deemed a "place of public accommodation" for some purposes does not mean that the Act automatically applies to all phases of its operations. To the contrary, they posit that the various services, facilities, and programs offered by the university must be compartmentalized, and each must be analyzed individually to see if it constitutes a "place of public accommodation" within the meaning of the statute. In their view, the university's academic programs, when viewed separately from its other operations, do not fall within the statutory definition. One of the reasons they do not, according to plaintiffs, is that the only people allowed in the academic programs are those who apply, meet the requisite academic standards, and are admitted by the university. Accordingly, in plaintiffs' view, those programs cannot be regarded as being "available to the public," and because they are not "available to the public," they cannot be a "public accommodation."

To accept plaintiffs' analysis would mean that while the university would be prohibited from operating racially segregated snack bars or bathrooms, the Act would not prevent it from maintaining disparate academic standards based solely on race. In effect, Jim Crow would be free, as a matter of State law, to return to the classroom. We doubt that our legislature could have intended such an absurd and unjust result. We need not explore this issue further, however, for even if plaintiffs' "compartmentalization" theory were valid, and even if the university's academic programs did not, in fact, constitute a "place of public accommodation," they would still not be beyond the reach of the Act.

This is so because the Act, by its terms, is not limited to discrimination in "accommodations." It also prohibits public officials such as plaintiffs from denying or refusing, based on unlawful discrimination, the full and equal enjoyment of the "advantage, facilities or privileges of [their] office or services or of any property under [their] care." (Ill. Rev. Stat. 1989, ch. 68, par. 5—102(C).) Adhering to the precept that a court should construe a statute so that no word or phrase is rendered meaningless or superfluous (*Kraft, Inc. v. Edgar* (1990), 138 Ill. 2d 178, 189, 561 N.E.2d 656, 661), we believe that these additional categories must be given independent effect. That is, they should not be regarded simply as synonyms for the term "accommodations."

When given their plain and ordinary meaning, these additional categories are broad enough to encompass a State university's academic programs. That the public at large may have no right to freely partake of such programs is of no consequence. Unlike the situation with "accommodations," nothing in the statute requires that an "advantage," "facility," "privilege," or a "service" or "property" be of the sort which is "available to the public" before it will be deemed to fall within the ambit of the Act. Accordingly, we believe that when a university student is allowed to be harassed in the classroom, or is graded or tested differently, or is not allowed to enter into or continue in a program of study because of his or her race, color, or sex, he or she may fairly be said to have been denied or refused "the full and equal enjoyment of the advantage, facilities or privileges of the [university] officials' office or services or property under their care because of unlawful discrimination." That is precisely what was charged here. It was therefore within the Department's legitimate authority to pursue these charges.

■■ As an additional basis for opposing the Department's actions, the plaintiffs cite article 5A of the Act (Ill. Rev. Stat. 1989, ch. 68, pars. 5A—101 through 5A—102), which outlaws sexual harassment in higher education. Plaintiffs claim that under that provision, which was added to the Act in an amendment promulgated in 1983, sexual harassment is now the only discriminatory act that a college administrator or faculty member is prohibited from committing in an academic context. We disagree. In our view, article 5A (Ill. Rev. Stat. 1989, ch. 68, pars. 5A—101 through 5A—102) was intended not as a limitation on university officials' liability, but as expansion of it.

This interpretation is supported by the legislative debates on the amendment. Those debates are, of course, an appropriate source for ascertaining the legislature's intention. (*Schorsch v. Fireside Chrysler-Plymouth, Mazda, Inc.* (1988), 172 Ill. App. 3d 993, 997, 527 N.E.2d 693, 696.) They show that when article 5A was proposed, the General Assembly assumed that unlawful discrimination in higher education was already prohibited by the Act. Sexual harassment, however, was recognized as a separate and distinct problem, and the purpose of the amendment was simply to expand the statute to address that problem. As Representative Koehler explained during the debates:

> "[This amendment] amends the Illinois Human Rights Act to include sexual harassment in higher education as a civil rights violation. Under the Human Rights Act, discrimination on the basis of sex already constitutes a civil rights violation. However, it is important to point out that there is a distinct difference between sex discrimination, which deals with prejudice[,] and sexual harassment, which deals with a hostile environment and repeated torment."

Plaintiffs likewise can find no support for their position in the fact that when the General Assembly added article 5A (Ill. Rev. Stat. 1989, ch. 68, pars. 5A–101 through 5A–102) to the Act in 1983, it amended the statute's "declaration of policy" provision to include parallel language specifying that sexual harassment is now prohibited in higher education as a matter of public policy. (Ill. Rev. Stat. 1989, ch. 68, par. 1–102(A).) This amendment merely harmonized the statutory "declaration of policy" with the new substantive provisions contained in article 5A. Given the common origin of these changes, we believe that the amendment can only be construed as reflecting the same legislative design to expand, rather than contract, the liability of university officials. In any case, we are wary of giving too much significance to what is or is not included in the statute's "declaration of policy," for such a declaration, like a preamble, is no part of the Act. *Hayen v. County of Ogle* (1983), 116 Ill. App. 3d 80, 84, 451 N.E.2d 612, 615, *aff'd* (1984), 101 Ill. 2d 413, 463 N.E.2d 124.

■ For the foregoing reasons, we hold that the Human Rights Act does authorize the Department and its investigators to pursue the discrimination charges filed here against SIU's Board of Trustees and faculty members. Accordingly, the plaintiffs' motion for summary judgment should have been denied, the Department's cross-motion for summary judgment should have been granted, and

the writ of prohibition requested by plaintiffs should have been refused. The judgment of the circuit court of Jackson County is therefore reversed.

Reversed.

LEWIS, HENRY, J., concurs.

JUSTICE WELCH, dissenting:
The Illinois Human Rights Act (the Act) (Ill. Rev. Stat. 1989, ch. 68, par. 1—101 *et seq.*) prohibits certain types of discrimination in employment (article 2), real estate transactions (article 3), access to financial credit (article 4), and the availability of public accommodations (article 5). It also prohibits sexual harassment in higher education (article 5A). It is apparent that the only sections of the Act which could conceivably apply to the case at bar are contained in article 5, entitled "Public Accommodations."
Section 5—101 of the Act (Ill. Rev. Stat. 1989, ch. 68, par. 5—101) provides the following pertinent definitions for purposes of article 5:
"(A) Place of Public Accommodation. (1) 'Place of public accommodation' means a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public.
(2) By way of example, but not of limitation, 'place of public accommodation' includes facilities of the following types: inns, restaurants, eating houses, hotels, soda fountains, soft drink parlors, taverns, roadhouses, barber shops, department stores, clothing stores, hat stores, shoe stores, bathrooms, restrooms, theatres, skating rinks, public golf courses, public golf driving ranges, concerts, *** roads, omnibuses, busses, stages, airplanes, street cars, boats, funeral hearses, crematories, cemeteries, and public conveyances on land, water, or air, public swimming pools and other places of public accommodation and amusement.
***
(C) Public Official. 'Public official' means any officer or employee of the state or any agency thereof, including state political subdivisions, municipal corporations, park districts, forest preserve districts, educational institutions and schools." Ill. Rev. Stat. 1989, ch. 68, pars. 5—101(A), (C).

Section 5—102 of the Act (Ill. Rev. Stat. 1989, ch. 68, par. 5—102), provides that it is a civil rights violation for any person on the basis of unlawful discrimination to:

"(A) Enjoyment of Facilities. Deny or refuse to another the full and equal enjoyment of the facilities and services of any public place of accommodation;

***

(C) Public Officials. Deny or refuse to another, as a public official, the full and equal enjoyment of the accommodations, advantage, facilities or privileges of the official's office or services or of any property under the official's care because of unlawful discrimination." Ill. Rev. Stat. 1989, ch. 68, pars. 5—102(A), (C).

The majority concludes that it does not matter whether the university is considered a place of public accommodation within the context of its academic programs because section 5—102(C), which prohibits discrimination by a public official, does not require that such discrimination take place within a place of public accommodation. The majority reasons that, because officers and employees of the university are clearly public officials within the meaning of the Act, they may not unlawfully discriminate even in the context of the university's academic programs, regardless of whether such programs constitute places of public accommodation.

I think the majority's conclusion is patently wrong. A plain reading of Article 5 of the Act, and the Act as a whole, indicates that Article 5 applies only to places of public accommodation and prohibits discrimination by public officials only in places of public accommodation. If this were not the case, there would be no logical reason to include section 5—102(C) within article 5, which deals only with places of public accommodation. Furthermore, a plain reading of Article 5 of the Act, and of the Act as a whole, leads unavoidably to the conclusion that the university is not a place of public accommodation, at least in the context of its academic programs.

Section 5—101(A)(1) of the Act defines a place of public accommodation as a business, accommodation, refreshment, entertainment, recreation or transportation facility whose goods and services are made available to the general public. When interpreting a statute, courts must give the language of that statute its plain and ordinary meaning. (*Williams v. Illinois State Scholarship Comm'n* (1990), 139 Ill. 2d 24, 50-51, 563 N.E.2d 465, 477.) According the words of section 5—101(A)(1) their plain and ordinary meanings, it can hardly be said that the academic programs of a university fall within any of

these categories. The academic programs of a university cannot reasonably be classified as a business, which is ordinarily considered a commercial or mercantile endeavor. Nor can a university's academic programs reasonably be classified as an accommodation, which is defined as, and ordinarily considered to be, something that is supplied for convenience or to satisfy a need, such as lodging, food and services as at a hotel, or a seat or berth as on a train. (Webster's Third New International Dictionary 12 (1976).) Finally, the academic programs of a university would not ordinarily be considered a refreshment, entertainment, recreation, or transportation facility.

Furthermore, the services and facilities of a university's academic program are not available to the general public. Instead, they are available only to qualified students who meet rigid admission requirements. Only to those students who meet the requirements for admission are the services, facilities, and privileges of the university's academic programs available. In this respect, the university's academic programs resemble a private club, which is expressly exempted from the prohibitions of the Act. (Ill. Rev. Stat. 1989, ch. 68, par. 5—103(A).) Indeed, the majority acknowledges that the public at large has no right to freely partake of the university's academic programs.

My conclusion that the academic programs of a university are not places of public accommodation within the meaning of the Act is made clear by an examination of the enumerated examples of places of public accommodation contained in section 5—102(A)(2). That section sets forth by way of example, but not of limitation, such places of public accommodation as restaurants, hotels, taverns, retail stores, barber shops, bathrooms, theatres, railroads, cemeteries "and other places of public accommodation and amusement." This list of examples of places of public accommodations does not include schools or universities. While the list is meant to be illustrative and not exclusive, under the doctrine of *ejusdem generis*, when a statutory clause specifically describes several classes of things and then includes "other things," the word "other" is interpreted as meaning "other such like." (*Coldwell Banker Residential Real Estate Services of Illinois, Inc. v. Clayton* (1985), 105 Ill. 2d 389, 396, 475 N.E.2d 536, 539.) Looking at the places of public accommodation enumerated in section 5—102(A)(2), I do not find that a university is similar to any of those places enumerated. The places listed include retail businesses, places of accommodation such as hotels and restaurants, and places of amusement or entertainment such as theatres and skating rinks. Nothing included in the list is similar to a university. Thus, I must

conclude that the academic programs of a university are not considered a place of public accommodation within the meaning of the Act.

I find further support for my conclusion in the reasoning of the New Mexico Supreme Court in interpreting a similar definition of "public accommodation" in its own civil rights statute. In deciding that the academic programs of a university did not fall within the definition of a public accommodation, the court stated:

"Based upon the facts of this case, we hold that the University of New Mexico is not a 'public accommodation' within the meaning of the New Mexico Human Rights Act [citation], and is therefore not subject to the jurisdiction of the Human Rights Commission in this instance. In so holding, we look to the historical and traditional meanings as to what constitutes a 'public accommodation'.

The prohibition against discrimination in public accommodation arose from the common law duties of innkeepers and public carriers to provide their services to the public without imposing unreasonable conditions. *See* Avins, *What is a Place of 'Public' Accommodation?*, 52 Marq. L. Rev. 1 (1968). The United States Supreme Court recognized these common law duties when it stated that '[i]nnkeepers and public carriers, by the laws of all the States, so far as we are aware, are bound, to the extent of their facilities, to furnish proper accommodation to all unobjectionable persons who in good faith apply for them.' *Civil Rights Cases*, 109 U.S. 3, 25, 3 S. Ct. 18, 31, 27 L. Ed. 835 (1883). Early statutes in most states tended to codify the common law by prohibiting discrimination in places of lodging, entertainment and public transportation. *See* Avins, *supra.* Universities were not considered public accommodations under the early statutes." *Human Rights Comm'n v. Board of Regents* (1981), 95 N.M. 576, 577-78, 624 P.2d 518, 519-20.

A court should not and cannot inject provisions not found in a statute, however desirable or beneficial they may be. (*Droste v. Kerner* (1966), 34 Ill. 2d 495, 504, 217 N.E.2d 73, 79; *Parizon v. Granite City Steel Co.* (1966), 71 Ill. App. 2d 53, 70, 218 N.E.2d 27, 36.) There is no rule of construction which authorizes a court to declare that the legislature did not mean what the plain language of a statute imports. (*Droste*, 34 Ill. 2d at 503, 217 N.E.2d at 78.) The legislature did not include the academic programs of a university as a place of public accommodation, either in the definition contained in section 5—101(A)(1), or in the list of examples contained in section 5—

101(A)(2), nor can I reasonably construe those sections to include the academic programs of a university.

Finally, because I find no ambiguity in the language of the statute, I find that it is improper to resort to extrinsic aids to construction such as legislative history and legislative debates. (*In re A.M.C.* (1986), 148 Ill. App. 3d 775, 781, 500 N.E.2d 104, 108.) However, because the majority addresses the significance of the 1983 amendment to the Act (Public Act 83—89), which added article 5A prohibiting sexual harassment in higher education, I will do the same. Based upon its interpretation of the legislative debates surrounding this amendment, the majority concludes that unlawful discrimination in higher education was prohibited by the Act prior to the amendment, and that the addition of article 5A was an expansion on a university official's liability rather than a limitation on it. I cannot agree with the majority's conclusion, nor its interpretation of the legislative debates pertaining to Public Act 83—89. I interpret Representative Koehler's remarks not as an indication that unlawful discrimination was already prohibited by the Act in higher education, but merely as an attempt to distinguish between discrimination on the basis of sex in any context and sexual harassment. Again, I find no language in the Act itself to indicate that a university is included in the definition of "place of public accommodation," or that the legislature intended that it be so included.

Furthermore, the language of section 1—102(A), which sets forth the public policy represented in the Act, evidences the legislature's intent not to include universities within the purview of article 5 of the Act. That section states that the purpose of the Act is to secure for all individuals the freedom from unlawful discrimination in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations; and to prevent unlawful discrimination or sexual harassment in connection with real estate transactions based upon familial status and sexual harassment in higher education. I think that a plain reading of this section demonstrates the legislature's intention to exclude higher education from the prohibition against unlawful discrimination, but to prohibit only sexual harassment within the academic programs of a university. I think this intention is apparent from a plain reading of the statute. The most recent amendment to section 1—102 (Public Act 87—579) does not alter my interpretation of this section.

I also note the failure of a proposed bill which would have amended section 1—102(A) to expressly state that unlawful discrimination, as well as sexual harassment, is prohibited in higher educa-

tion. I find it likely that the proposed bill failed because the legislature did not intend for the Act to address unlawful discrimination in higher education.

Because an administrative agency has no greater powers than those conferred upon it by the legislative enactment creating it (*Village of Lombard v. Pollution Control Board* (1977), 66 Ill. 2d 503, 506, 363 N.E.2d 814, 815), I think the trial court properly granted the university a writ prohibiting the Department from further proceeding on the complaints of discrimination by the university in the context of its academic programs.

I think it is important to mention that by my construction of the Act I do not wish to leave students such as the students here without a remedy. Discrimination on the basis of race, color, religion, sex, national origin, ancestry, age, marital status, or physical or mental handicap is as offensive in the classroom as in the workplace and should be as strongly condemned. However, I do not think the Act provides the appropriate remedy for the wrong.

Although the Act is the exclusive remedy in those situations to which it applies (Ill. Rev. Stat. 1989, ch. 68, par. 8—111(C)), because the academic programs of the university do not fall within the purview of the Act, students may seek redress elsewhere. (See *Ritzheimer v. Insurance Counselors, Inc.* (1988), 173 Ill. App. 3d 953, 527 N.E.2d 1281.) Thus, these students may find a remedy for unlawful discrimination in the classroom in title VI of the Civil Rights Act of 1964 (42 U.S.C. §2000d (1988)), title IX of the Education Amendments of 1972 (20 U.S.C. §§1681 through 1688 (1988)) and under other Federal statutory and Illinois constitutional and common law theories of discrimination.

Finally, I note that with respect to functions of the university other than its academic programs, my decision as to whether the university is a place of public accommodation might be different.